THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM L. JONES, Defendant-Appellant.

Fifth District   No. 76-27

Opinion filed December 30, 1977.—Rehearing denied January 31, 1978.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kelly D. Long, State's Attorney, of Hillsboro (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

The defendant, William "Bill" Jones, was convicted of the offenses of murder and attempted murder at a bench trial. The trial judge imposed concurrent sentences of not less than 10 nor more than 20 years upon the attempted murder conviction and not less than 20 nor more than 40 years upon the murder conviction.

The defendant presents the following arguments on appeal: (1) that the defendant was denied a fair trial because he had not been formally notified that the State intended to proceed on the murder charge instead of the prior attempted murder charge; (2) that the defendant never waived his right to a jury upon the murder charge; (3) that the State failed to prove that he had the requisite intent to commit the offense of murder since he was suffering from an "alcoholic blackout" at the time he committed the offense; (4) that the defendant was insane at the time that he committed the offense; (5) that the defendant was denied an opportunity to make a statement on his own behalf prior to the imposition of sentence, and the cause must, therefore, be remanded for resentencing.

At the trial, Dennis Kennedy, the defendant's nephew, testified that on March 9, 1975, he was residing with his uncle, Edward "Bud" Jones. At 2 a.m. Kennedy was awakened by the defendant who was pointing a .22-caliber automatic rifle at him. The defendant told Kennedy to go into the bedroom of Bud Jones. Defendant indicated that he was angry because they had not told him that his father was in the hospital. After Kennedy told the defendant that his father did not want to see him, the defendant shot Kennedy in the shoulder. The defendant directed Jones and Kennedy to enter the kitchen. At that point he told them that he was going to kill them. As the defendant raised the rifle to his shoulder and pointed it at Kennedy's chest, Bud Jones jumped at the defendant and the defendant fired, striking Kennedy in the arm. Kennedy fell to the floor, but heard four or five more shots. Kennedy then went out the side door to his uncle's house across the street.

The uncle, David Jones, testified that Dennis Kennedy was bleeding badly when he came to the door and Jones immediately applied a tourniquet to Kennedy's arm. Shortly thereafter, David Jones received a telephone call from the defendant who was asking him to help with Bud Jones. At approximately 2:30 a.m., Lester Nockman, the defendant's uncle, received a telephone call from the defendant who was boasting about having shot Dennis Kennedy. Mr. Nockman then contacted the Montgomery County Sheriff's Department. While Sheriff Carlock, Lester Nockman, Thomas Jones (another brother of the defendant) and Deputy Sheriff Moore were proceeding toward the scene of the shooting, they came upon the defendant in the Taylor Springs Business District, driving his own car. The defendant stopped in the middle of the street, and got

out of his car with a rifle in his hand. After refusing to discard his rifle, the defendant reentered his car and started to drive off, whereupon Deputy Moore fired one shot at the right rear tire. The defendant then exited his car again and questioned whether the officer was shooting at him. He then returned to his car and drove off.

Sheriff Carlock and Deputy Sheriff Moore followed the defendant to the house where the shooting had occurred and again confronted him with the request to surrender and to allow medical attention for Bud Jones. When the ambulance arrived, the defendant permitted the ambulance attendants to enter the house and remove Bud Jones. After 15 minutes of fruitlessly trying to talk Bill Jones into surrendering, Sheriff Carlock left the house and ordered that tear gas be fired into the house. The defendant then came out of the house and gave up his rifle and shells.

Sheriff Carlock, Deputy Sheriff Moore, and Lester Nockman all testified that the defendant seemed to be scared but did not appear drunk. The arresting officer, State Trooper Strom, stated at the time the defendant was apprehended "his eyes were glassy and watery and his face was red." Strom explained, however, that these symptoms are characteristic of a reaction to tear gas, and Strom noted that the defendant walked normally and did not smell of alcohol. State Troopers Graybow and Dutan also testified that the defendant's eyes were bloodshot, glassy and watery at the time of the arrest but that he walked normally and did not smell of alcohol.

Five hours after the defendant's arrest, he was removed from his cell for an interview with Assistant State's Attorney Hanafin. Before Hanafin had an opportunity to read the defendant his rights, the defendant blurted out that he was sorry that he shot his brother. After the defendant was read his Miranda rights, a statement was taken in which he proclaimed that he had not meant to shoot Bud Jones. He described a day long drinking binge in which he drank beer, wine, gin and vodka with his aunt and uncle and common-law wife. According to Hanafin, the defendant stated that he assumed that he drove himself to his father's house in Taylor Springs. The defendant recalled taking the gun out of his car and loading it inside the house. The defendant stated that he could not remember how he had entered the house, nor any of the events on the second floor except the fact that he had startled Dennis Kennedy. Defendant did, however, recall hearing one gun shot upstairs, and a subsequent shot in the kitchen. The defendant explained to Hanafin that Bud Jones lunged at him, causing the gun to go off at least three times accidently.

Bud Jones did not die as a result of the gun shot wounds until April 7, 1975. Prior to the death of his brother, the defendant had been arraigned and indicted upon two counts of attempted murder, two counts of

aggravated battery and one count of armed violence. On April 17, 1975, the grand jury returned an indictment on three counts of murder, which superseded one of the attempted murder counts.

■■ We reject the defendant's contention that he was denied a fair trial because he had not been formally arraigned upon the murder indictment. While the subsequent murder indictment was never read to him at an arraignment, the defendant concedes, and the record reflects, that he was well aware of the pending murder indictment. Furthermore, when the case was called for trial, the court called it upon the murder indictment and the defense counsel answered ready. The Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 113—6) states: "Neither a failure to arraign nor any irregularity in the arraignment shall effect the validity of any proceeding in the cause if the defendant pleads to the charge or proceeds to trial without objecting to such failure or irregularity." (Emphasis added.) Since the defense counsel answered ready when this cause was called for hearing upon the murder indictment, the defendant waived his failure to have an arraignment upon the charge. In *People v. Hill*, 17 Ill. 2d 112, the Illinois Supreme Court held that the omission of a formal plea constituted reversible error only if the defendant was prejudiced thereby.

■■ The defendant also argues that he never waived his right to a jury trial upon the murder indictment but rather waived it only upon the attempted murder charge. While the defendant was never formally arraigned, he was served with a copy of the warrant for his arrest upon the murder indictment. The defendant was, therefore, aware that he was being tried for murder when he executed the jury waiver. When the cause was called for trial upon the murder, neither the defense counsel or the defendant objected that the jury waiver did not pertain to the murder charge.

The theory of defense in this case was that the defendant was suffering from an "alcoholic blackout" at the time he committed the offense and, therefore, lacked the requisite intent to commit the offense of murder or attempted murder. At the trial, Dr. Bornstein testifed that he had conducted two one-hour interviews with the defendant two months after his arrest. Based upon those interviews, psychological tests, police reports, and Dennis Kennedy's written statement, Dr. Bornstein diagnosed that the defendant was suffering from "habitual excessive drinking" and "alcoholic addiction." Dr. Bornstein stated that, in his opinion, the defendant was suffering from "acute alcoholic intoxication" and an "alcoholic blackout" at the time he committed the offense. Dr. Bornstein explained that the reason the defendant was capable of recalling events during his interview with the State's Attorney five hours after his arrest was because the defendant was still under the influence of

alcohol. Dr. Bornstein indicated that a person who learns something while intoxicated will remember it better while he is in that condition, and refer to this phenomenon as "state dependent learning." Dr. Bornstein also indicated that a person does not need to exhibit signs of acute intoxication in order to be suffering from an "alcoholic blackout." The fact that the defendant could drive a car to the middle of Taylor Springs and did not appear drunk to the persons who observed him did not mean that he was not suffering from such a blackout.

In rebuttal, the State called Dr. Goldsborough, a physician specializing in neuropsychiatry. Dr. Goldsborough had also interviewed the defendant on two occasions but did not use any scientific tests or physical examination. Based upon his observations of the defendant, Dr. Goldsborough concluded that the defendant was a "chronic alcoholic" but was not alcohol addicted. Dr. Goldsborough completely rejected the concept of "alcoholic blackout" as described by Dr. Bornstein. He regarded defendant's amnesia as a manipulative tool and stated that, in his opinion, the defendant was not suffering from any personality disorder at the time of the shooting and fully appreciated the consequences of his acts. Analyzing the defendant's relationship to his brother as a Freudian love-hate relationship, Dr. Goldsborough blamed the defendant's action upon a passive-aggressive personality.

The court stated that contrary to Dr. Goldsborough's testimony, it believed that alcoholic blackouts do in fact occur. The court, however, decided that the defendant, Bill Jones, was responsible for his actions at the time he committed the offense. The court reached this conclusion because the defendant was able to drive an automobile, able to recognize police officers, able to converse with the Sheriff, able to converse with his deceased brother and nephew, and was able to leave the house and return to the house. In connection with this analysis, the court observed that none of the persons at the scene, with the exception of Kennedy, thought that the defendant was intoxicated.

In conjunction with the defense argument that the defendant was suffering from an "alcoholic blackout," the defendant requested that the appellate court consider a study published by the National Institute of Mental Health entitled "Recent Advances and Studies of Alcoholism" (June 25, 1970). While this article describes the phenomenon of an "alcoholic blackout," this article describes nothing that is not contained in Dr. Bornstein's testimony.

The Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 6—3) states: "A person who is in an intoxicated or drugged condition is criminally responsible for his conduct unless such a condition either: (a) Negatives the existence of a mental state which is an element of the offense; or (b) Is involuntarily produced and deprives him of substantial capacity either to

appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Since the defendant's intoxication was by his own testimony voluntary, the question is whether he was so intoxicated that he could not form the intent to kill. This issue is a question of fact for the trier of fact.

In *People v. Winters*, 29 Ill. 2d 74, the defendant also argued that he was suffering from alcoholic amnesia at the time that he committed the offense. In affirming his conviction for murder, the court stated:

> "It is undisputed that the defendant's intoxication was voluntary, and voluntary drunkenness is ordinarily not a defense to the commisson of crime. (*People v. Strader*, 23 Ill. 2d 13, 21.) It is true that where intoxication is so extreme as to suspend entirely the power of reason and render the accused incapable of any mental action he cannot be convicted of any crime which involves specific intent or malice. (*People v. Minzer*, 358 Ill. 345.) Counsel argues that the defendant's condition evidences a clear case of alcoholic amnesia and that the defendant remembers drinking and then his memory lapsed for a period of several hours during which the offense was committed and his memory then returned. However, the defendant was able to testify in great detail as to what occurred up to the time of the fight with Gerald, including the amount of liquor consumed, the place of consumption, who was present, and various conversations with Gerald; he also recalled in detail his conversations with Freeman and Beaugard several hours later. It is clear that his mental faculties and power of reason were not entirely suspended, and the jury could properly find against the defendant." *People v. Winters*, 29 Ill. 2d 74, 80-81.

As in *Winter*, the defendant in this case remembered who he had been drinking with, how much alcohol he had consumed, where he had gone and all the events up until the time he entered the house. Since none of the persons who had seen him during the episode had described him as intoxicated, we believe that the defendant has failed to show that this intoxication was "so extreme as to suspend entirely the power of reason and render the accused incapable of any mental action." See also *People v. Hays*, 37 Ill. App. 3d 772; *People v. Hicks*, 35 Ill. 2d 390; *People v. Piesen*, 115 Ill. App. 2d 373.

The defendant also argues that he was suffering from a mental disease or defect and lacked substantial capacity to appreciate the criminality of his conduct or to conform conduct to the requirements of law. (Ill. Rev. Stat. 1975, ch. 38, par. 6—2(a).) The court has held that before alcoholism can be a mental disease or defect as to remove responsibility for an action, it must be of long duration and result in permanent mental disease. (*People v. Mask*, 34 Ill. App. 3d 668 (5th Dist.

1975).) There is no evidence that the defendant was suffering from any permanent disability or loss of his facilities.

The final issue in this appeal is whether the trial court's failure to ask the defendant if he wished to make a statement on his own behalf before imposing sentence requires that the cause be remanded for resentencing. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—4—1(a)(5).) Before imposing sentence the court considered a presentence report, and several psychiatric evaluations compiled during the trial. Furthermore, defense counsel argued factors in mitigation during the sentencing hearing. Thus, the court's failure to ask the defendant, prior to pronouncing sentence, whether he wished to say anything in his own behalf was harmless. In *People v. Spiler*, 28 Ill. App. 3d 178, 182, the court stated: "We hold that the omission by the court to permit defendant to make a statement is a technical or formal error which does not require a reversal. While we do not condone the actions of the trial court, we are satisfied that under the circumstances the sentence imposed would not have been otherwise."

For the reasons stated the judgment of the Circuit Court of Montgomery County is affirmed.

Judgment affirmed.

EBERSPACHER, P. J., and G. J. MORAN, J., concur.