THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DIXIE LEE HAMMOCK, Defendant-Appellant.

Fifth District    No. 77-131

Opinion filed January 9, 1979.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Terrence J. Hopkins, State's Attorney, of Benton (Raymond F. Buckley, Jr., and Curtis L. Blood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KUNCE delivered the opinion of the court:

The defendant, Dixie Lee Hammock, appeals from a sentence of 6 to 18 years imprisonment and from a conviction entered on a jury verdict of voluntary manslaughter in the Circuit Court of Franklin County.

Defendant was charged with murder. Defendant raised three affirmative defenses of insanity, intoxication or drugged condition, and use of force in defense of person pursuant to sections 6—2, 6—3, and 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, pars. 6—2, 6—3, and 7—1). Over defendant's objections, the jury was instructed on a modified Illinois Pattern Instruction, IPI Criminal No. 7.06 (1968) ("Issues in Voluntary Manslaughter-Intentional-Belief of Justification"); a modified IPI Criminal No. 7.04 ("Issues in Voluntary Manslaughter—Provocation"); IPI Criminal No. 7.05 ("Voluntary Manslaughter-Intentional-Belief of Justification"). After the court overruled defendant's objections, defendant tendered IPI Criminal No. 7.03 ("Voluntary Manslaughter-Provocation"). During jury deliberations, the court, with counsel present and on record, answered the jurors' questions concerning the multiplicity of manslaughter instructions. On appeal, defendant

initially contends that she should have been found not guilty by reason of her intoxicated or drugged condition. In the alternative, defendant contends that the voluntary manslaughter instructions should not have been given, because there was no evidence to support such instructions and that the court abused its discretion in denying probation and imposing an excessive sentence.

The evidence is undisputed that at approximately 9:20 p.m. on October 5, 1975, defendant shot Harold E. Claybrook four times in her home in Clebourne, Franklin County, Illinois. Defendant, age 38, had been Claybrook's mistress for approximately 15 years and had borne him a daughter, Lisa, age 13. Evidence was introduced that for the last 7 or 8 years of this relationship, Claybrook had on numerous occasions severely beaten and choked defendant. The four worst results of these beatings were a broken arm, broken noses, a miscarriage, and an aggravation of a prior spinal injury. In the six months prior to the shooting, Claybrook's behavior had become more violent and culminated in his firing a shot at defendant. Defendant had been an alcoholic for a number of years, consuming a fifth of vodka a day. As Claybrook had accused her of having affairs with other men, she seldom left the house, spending her days cleaning the house, watching television, and drinking vodka. Defendant had twice attempted to commit suicide and twice had been voluntarily admitted to Illinois mental health centers. Claybrook, a construction worker, traveled about the country, his "home" being in Tulsa. It was not unusual for defendant and her daughter and Claybrook's wife and legitimate daughter to accompany him on these moves. Claybrook provided an apartment for the defendant. At the time of the shooting, Claybrook had decided to return to Tulsa and had expressed a desire for defendant and her daughter to accompany him. Defendant decided to leave Lisa with relatives and enter an alcoholic treatment center in New Orleans, Louisiana. After completion of treatment, she did not intend to return to Claybrook. Defendant had left deceased twice, but she returned to him each time upon his promise that things would be like they were when their relationship was initiated. It is against the foregoing background that we discuss the events of October 15, 1975.

On October 15, 1975, defendant conducted her routine activities until 6:30 p.m. Then she became drunk and drove Lisa to relatives in order for Lisa to attend church services. When drunk, defendant did not manifest the characteristics of a person under the influence of alcohol for she would talk distinctly and walk straight. However, people who knew defendant could tell when she was under the influence of alcohol. When she arrived back home, Claybrook, who was drunk, was there. They became engaged in an argument involving a heated discussion of her admittance to an alcoholic rehabilitation center. After being informed

that defendant would not rejoin him in Tulsa, Claybrook insisted that she get Lisa, who had planned to spend the night with a relative. When defendant refused to do his bidding, Claybrook threatened to beat her and shoved her as she watched television.

After approximately a half hour, Claybrook left but returned within a short time, and they continued their argument. He then left for a second time, returning shortly, at which time he continued to argue and shove defendant. At approximately 9:15 p.m., defendant emptied the garbage, and Isadore Grisko, a neighbor of defendant's, heard Claybrook holler, "you son of a bitch, I'll kill you." Although the Griskos had previously heard Claybrook threaten defendant, they had never heard her threaten him. When she got up to go to the bathroom, Claybrook shoved her against the door frame causing a knot on her arm. After she returned from the bathroom, Claybrook stated he was going to rest. He also made remarks which indicated to defendant that when he awoke, he would get Lisa, take her to Herrin and rape her. Claybrook had a habit of pretending he was asleep, and he was also a light sleeper. During this 2-hour period of argument, both Claybrook and defendant continued drinking.

Defendant got the gun from the bedroom and shot Claybrook. She did not remember how many times she fired the gun. Claybrook made no effort to get up if he did see her. While shooting Claybrook, defendant felt an explosion of rage and characterized her conduct as:

> "I had this tremendous feeling and I was, inside my head I was arguing, it was like, like, [sic] detached, I wasn't, I was, and then I wasn't, it seemed like my body wasn't mine.
>
> &ast; &ast; &ast;
>
> I did not decide to do anything. I just went [to get the gun]. This awful, this feeling just went all over me.
>
> &ast; &ast; &ast;
>
> I was walking towards the bedroom and my head, I don't know how to explain it, but I was, in my head I was arguing, yet I was detached from the whole thing.
>
> &ast; &ast; &ast;
>
> I had a feeling come over me like I never had before, and I knew in my head, I said, no, I was moving and I was picking up the gun and I shot him."

She then called the operator and asked for the police, an ambulance, and her brother-in-law, Bill Freeman.

The Franklin County sheriff's office responded to the call and found defendant watching television. After asking defendant if the call of a shooting had been correct and being advised that it was, the officers were admitted to the house, and defendant was advised of the *Miranda*

warnings. She appeared to be in a mild state of shock and would lapse into periods of crying and hysteria. At 1:30 a.m. on the morning of October 16, 1975, defendant gave a statement to the Franklin County State's Attorney's Investigator which was substantially the same as the one she gave to the officers at the scene. No weapons were found on or about Claybrook, and the house was neat and clean. Defendant did not appear drunk nor under the influence of drugs. At the officer's request, she successfully walked a straight line. A half-full bottle of vodka and a mixed drink was found in the house. At the officer's request, defendant produced the gun from a desk in the bedroom. The gun was a nine-shot, 22-caliber Harrison and Richardson pistol which contained four expended casings and five live casings, one of which appeared to have misfired. Defendant stated that she placed the gun close to Claybrook's face when she fired the first shot and did not remember how many times she shot him. She stated that she and Claybrook had become involved in an argument over her admittance to the alcoholic rehabilitation center, and he stated that he would take a nap and upon awaking would give her a good beating. When her relatives arrived, she stated to them, "I loved him [Claybrook], but I had to kill him."

Dr. Leonard Horecker, a psychiatrist, diagnosed defendant as having "an emotional structure that can be labeled under the heading of personality disorder, passive aggressive personality and with some anti-social factors entering into the personality, but a major passive aggressive personality." A passive-aggressive personality is a mental disease, but he was of the opinion that defendant did not lack substantial capacity to appreciate her behavior on the night of October 15, 1975, nor did she lack substantial capacity to conform her behavior to the requirements of law.

The defendant initially contends that she was not proved sane at the time of the offense. Dr. Griffin, a general physican who had treated defendant for physical and emotional problems for 6 years, and defendant's sister testified that they were of the opinion that defendant could not conform her conduct to the requirements of law and could not appreciate the criminality of her acts during the shooting of Claybrook. Dr. Horecker, a psychiatrist with many years of practice and outstanding credentials in the field of psychiatry, testified he was of the opinion that defendant's mental disease, passive-aggressive personality, did not prevent her from conforming her conduct to the requirements of law. The question of defendant's sanity at the time of the crime is a question of fact to be determined by the trier of fact, and we will not disturb the jury's finding unless it is so manifestly against the weight of the evidence as to indicate that the verdict was based on passion and prejudice. (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) Obviously, the jury gave more weight and credibility to Dr. Horecker's testimony than that of

Dr. Griffin and defendant's sister. Therefore, we will not disturb the jury's finding.

■■ ■ As insanity was a jury question, so was the issue of whether defendant was so intoxicated or drugged that her power of reasoning was entirely suspended so that she was incapable of any mental action. (*People v. Jones* (5th Dist. 1977), 56 Ill. App. 3d 600, 371 N.E.2d 1150.) Although defendant had some difficulty remembering the events of the evening of October 15, 1975, she testified in detail to those events and stated she called police because when a shooting has occurred, the police should be called. Therefore, it is clear that her mental function and power of reasoning were not entirely suspended, and the jury could properly find against the defendant. See *People v. Winters* (1963), 29 Ill. 2d 74, 193 N.E.2d 809.

Defendant's third contention is that the court improperly gave voluntary manslaughter instructions at the State's request and over defense's objections because there was no evidence of voluntary manslaughter. Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—2) states:

> "Voluntary Manslaughter.) (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed, or (2) Another whom the offender endeavors to kill, but he negligently or accidently causes the death of the individual killed.
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.
>
> (b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

■■■■ In considering whether an instruction is proper on a certain theory, a reviewing court will not weigh the evidence as to whether it is sufficient to support that theory. If there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, an instruction defining that crime should be given. (*People v. Harris* (1956), 8 Ill. 2d 431, 134 N.E.2d 315; *People v. Hall* (5th Dist. 1975), 25 Ill. App. 3d 992, 324 N.E.2d 50.) The only types of provocation recognized as serious enough to reduce the crime of murder to voluntary manslaughter are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property. (*People v. Free* (1st Dist. 1976), 37 Ill.

App. 3d 1050, 347 N.E.2d 505.) The sufficiency of the provocation to cause sudden and intense passion is a matter to be determined by the trier of fact. (*People v. Stowers* (1st Dist. 1971), 133 Ill. App. 2d 627, 273 N.E.2d 493.) There is evidence in the record to support a finding of guilty of manslaughter. The defendant had been beaten severely on a number of occasions in the past. On the night of Claybrook's death, defendant had been subjected, with only two brief lapses of time, to over 2 hours of verbal and physical abuse because deceased was not happy with the prospect of the termination of his relationship with defendant. Moments prior to his death, deceased had threatened to kill defendant and informed her that after taking a nap, he would beat her. Deceased had a habit of pretending sleep and awakening suddenly. Immediately thereafter defendant went to the bedroom, got the gun, and shot defendant. Although immediately after the shooting defendant stated that deceased was asleep when she shot him, at trial she testified that when she went to get the gun, deceased was yelling at her and that his eyes were open indicating that he was awake at the time the fatal shots were fired. Therefore, the jury could have found that deceased was awake and would at any minute carry out his threat to kill her. Little weight could have been given to the fact that deceased did not lunge or attempt to resist defendant, because deceased could have been too surprised or shocked at seeing defendant come at him with the gun as she had never physically threatened him before that time. The deceased was intoxicated which could have been found to reduce his ability to resist. In view of the evidence of prior severe beatings coupled with the current threat of death or great bodily harm which had followed hours of physical and mental abuse, and the prospect that deceased would immediately carry out his threats which so closely preceded the shooting, it is our opinion that the trial court was justified in submitting for the jury's consideration the question of whether the killing resulted from a sudden and intense passion before defendant's voice of reasoning had returned.

The defendant contends that the trial court abused its discretion in denying probation and in imposing a sentence to the Department of Corrections for not less than 6 years nor more than 18 years. Defendant's attack is two-pronged: (1) that the court based the sentence on its belief that defendant should have been found guilty of murder, and (2) that the sentence is disproportionate to defendant's history and character and to her potential for rehabilitation.

When sentencing the defendant, the court stated:

"When you cut through all the evidence, all the statements and documents that were introduced into this case, you find that the base upon which all this is assembled, what transpired, what

ultimately resulted in a jury trial of a murder case, arose as a result of drunkenness, drug abuse, adultery, illegitimacy, idleness, attempted suicide, mental and physical abuse by the decedent, *and mental abuse to a certain degree by the defendant*; as a matter of fact, they had a violent argument the night the deceased died. Throw all that potpourri of sordidness into a pot and the natural result is what happened here; a human-induced death by another human being. This didn't exist for a matter of a year. This pot was boiling for a period of 13, 14, 15 years. The defendant testified that her response, immediate response, without question, was that she couldn't take another beating the night of the incident. And there was a lot of evidence that she had been beaten, abused and mistreated. Her solution was to take the life of another human being into her own hands. The court feels that there is alternatives to that; she could have left, she had a car, although I think she testified at a period of time that she finally forgot how to drive, I think she might even had an accident while she was trying to. She had a family that she could have turned to, which she didn't, she felt that she should not or could not. They were both heavy drinkers, they were drunks. The testimony shows they were both drunks, she was a drug abuser. She lived on and off with this man for a period of years and bore an illegitimate child. The man's wife knew that she existed and, as a matter of fact, at one time they had an argument which resulted in some physical problems between the two in a bar. But that didn't shame the defendant any. She continued to see this woman's husband, bore him a child; all through these years, apparently, felt no loss of moral character or any concern about morals, society, laws, *violating the laws constantly during that period of time.*

Now, the argument would be, apparently, that the killing was the catalyst about which her life has changed. She's got several letters here from friends, people of her acquaintance that feel that she has substantially changed, *she's a fit subject for rehabilitation, but the court cannot be swayed by that* because if that were true, everybody that had a traumatic experience, every one who was living under strain and stress could take the law into their own hands, find their own solutions and then swear to God that they were on a path to rehabilitation, and no one would ever be punished for any cause whatsoever.

❋ ❋ ❋

So, it is the court's finding that the judgment will be entered on the verdict. That the evidence in this case the court felt would

support a finding of Murder, the jury found she was guilty of Voluntary Manslaughter, *in effect, the jury took the mitigating circumstances out and the questions and all related matters out of the hands of the court and made a finding of Voluntary Manslaughter, which mitigated the actual act of the defendant.* They could have found her guilty of Murder, just as easy as they could of Voluntary Manslaughter.

Therefore, following the requirements of Section 1005—8—1 it states that for a Class 2 felony, the minimum term, the maximum term shall be any term in excess of 1 year not exceeding 20 years, and under sub-paragraph (3) for a Class 2 felony, the minimum term shall be 1 year unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term, which shall not be greater than one-third of the maximum term set in that case by the court. While the court is in no mood to severely question the decision of the jury finding Voluntary Manslaughter, however, there is a person that is deceased in this case and there is no mention of the man who is now dead, and the court is well aware that his character was on a par with the defendant's and they were a sordid, sorry couple for years and years and years, and he shall not be forgotten, as sorry as he was.

Taking all these things into consideration, the court passes sentence on the defendant and the minimum term shall be 6 years and the maximum term shall be 18 years. The defendant shall be returned to the county jail until such time as a mittimus can be issued and the sentence of the court carried out, at no bail." (Emphasis supplied.)

■■ Defendant argues that she should have been sentenced to probation. Our supreme court has consistently held that the scope of review from a denial of an application of probation is limited to whether the trial court exercised its discretion or acted arbitrarily. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168, 170; *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300, 303; *People v. Carpenter* (1953), 1 Ill. 2d 347, 115 N.E.2d 761; *People v. Rege* (1976), 64 Ill. 2d 473, 356 N.E.2d 537, 541; *People v. Waud* (1977), 69 Ill. 2d 588, 373 N.E.2d 1). Section 5—6—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—6—1) provides that the court shall impose a sentence of imprisonment upon an offender if, having regard to the nature and circumstance of the offense, and to the history, character, and condition of the offender, the court is of the opinion that probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be

inconsistent with the ends of justice. We believe that the trial court exercised its discretion and did not act arbitrarily. The denial of the application of probation did not occur because defendant fell within the trial judge's category of disfavored offenders. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168.) Further, the court's remarks were neither venal nor unduly harsh. (*People v. Waud* (5th Dist. 1976), 43 Ill. App. 3d 85, 356 N.E.2d 628, *aff'd* (1977), 69 Ill. 2d 588, 373 N.E.2d 1.) As the court pointed out, defendant could have avoided the situation by leaving the house after decedent had twice departed or could have gone to the Griskos' house after emptying the garbage when decedent threatened her life. Yet she returned to the house. The nature and circumstances of the offense would indicate that the denial of probation was appropriate.

█▌ █ The defendant further contends that the trial court abused its discretion in sentencing defendant to the Department of Corrections for not less than 6 years nor more than 18 years by considering that the jury mitigated the offense by finding her guilty of voluntary manslaughter rather than murder. Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)) grants the reviewing courts the power to reduce the sentence imposed by the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Waud* (5th Dist. 1976), 43 Ill. App. 3d 85, 356 N.E.2d 628, *aff'd* (1977), 69 Ill. 2d 588, 373 N.E.2d 1.) However, the decisions of our supreme court have firmly established that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of this discretion, the sentence of the trial court may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330.) In the case at bar, we find that the court did consider improper factors in sentencing defendant. The court erred in considering that the jury removed any mitigating factors from the offense. Further, the court stated that the defendant inflicted mental abuse on the decedent. While there was some evidence that on rare occasions defendant would verbally argue with deceased, there is no evidence that she was the instigator of these arguments, and we can hardly see where she engaged in mental abuse of the deceased. The trial court also indicated that the defendant was a persistent law violator, although she in fact had no previous criminal record. Considering the history and character of the defendant and the nature and circumstances of the offense, the lack of previous offenses, the substantial evidence in mitigation indicating that she is a good prospect for early rehabilitation, and the failure of the State to present any evidence in aggravation, we exercise our power under Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)) and reduce defendant's sentence to the Department of Corrections to not less than 3 years nor more than 9 years.

44

The judgment of the Circuit Court of Franklin County is affirmed as to the conviction and denial of probation. The minimum and maximum term of imprisonment is modified and reduced from a term of 6 to 18 years to a term of 3 to 9 years. We order issuance of an amended mittimus consistent with the modified sentence.

Affirmed as modified.

G. J. MORAN, P. J., and KARNS, J., concur.