THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY EHRICH, Defendant-Appellant.

Fourth District   No. 4—87—0369

Opinion filed February 11, 1988.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Greg Roosevelt, State's Attorney, of Lincoln (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a bench trial, defendant Jeffrey Ehrich was convicted of home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)) and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)). He appeals, contending (1) the State did not disprove his affirmative defense of voluntary intoxication beyond a reasonable doubt; (2) the State did not prove him guilty of burglary beyond a reasonable doubt

in that there was insufficient evidence he entered a dwelling with an intent to commit a theft; (3) the State did not prove him guilty of home invasion beyond a reasonable doubt because there is no evidence he caused injury to any of the occupants of the dwelling which he entered; and (4) he is entitled to a new sentencing hearing because in imposing sentence, the trial court improperly considered as an aggravating factor an essential element of the offense of home invasion.

The charges against Ehrich stemmed from his unauthorized entry into the Lincoln residence of the Norman Clark family. Testifying on behalf of the State, Mr. Clark stated his house has three stories and a full basement. The bedrooms are on the second floor. The first floor contains a kitchen, dining room, living room, bathroom and office. At approximately 3 a.m. on the morning of July 3, 1986, he was awakened by the sound of his then seven-year-old daughter Krista crying. He went to Krista's bedroom and saw Ehrich sitting on the bed with Krista in his lap. Ehrich had his arms around Krista and his hand over her mouth. Clark began hitting Ehrich from behind in order to enable Krista to get free. The two men struggled, and the bed fell apart. Ehrich rolled on top of Clark and then stood up and started swinging at him. All the while, Ehrich was "whimpering about why I was hurting him, that he wasn't doing anything." Clark kicked Ehrich off of him and sent him falling across the room into a window.

Clark then chased Ehrich into the master bedroom, where Ehrich turned, put his fists up and said he was leaving the house. Clark told Ehrich he (Ehrich) was not going to leave, and he was going to "get down on the floor and do exactly what I tell you" until the police arrived. Clark testified he did not have any trouble understanding Ehrich's words. After Ehrich persisted in his attempts to leave the Clark home, Clark started hitting him with a bed slat. Eventually Ehrich sat down on a couch where he remained until the police arrived.

Clark further testified Ehrich gained entry to his home through an unlocked basement window, which was hinged at the top. A few days earlier Clark had taken some items out of the basement through the window and had forgotten to lock it. Directly below the window are some pipes which are two feet off the ground. There is apparently a drop of six feet from the window to the pipes. Laundry detergent which had been located on a stand near the window was found spilled on the floor after Ehrich's intrusion into the Clark home. All doors in the house were locked at the time of Ehrich's intrusion. Once inside the basement, Ehrich would have had to go through the laundry room, the furnace room and up two staircases in order to get to the

second floor of the Clark home.

During the days immediately following Ehrich's intrusion, Krista and the Clark's then 11-year-old son Brian remained frightened. Krista did not want to be away from her parents. For the first several months after the incident, both children spent nights in their parents' bedroom. On the first few nights after the intrusion, Clark had to hold Krista's hand and talk to her before she could go to sleep. Prior to Ehrich's intrusion, Krista never had any problems sleeping in her own room. Krista and Brian underwent extensive counseling for problems stemming from Ehrich's intrusion into their home.

On cross-examination, Clark stated he did not smell an odor of alcohol about Ehrich on the night of the intrusion. He further testified examination of the rooms which Ehrich must have traversed in order to reach the second floor revealed nothing was disturbed, with the apparent exception of the spilled laundry detergent near the basement window through which Ehrich must have entered.

Clark's wife Gail testified that in the early morning hours of July 3, 1986, she was awakened by her husband screaming, "What are you doing in my house?" She ran to Krista's room and saw Ehrich kneeling on the floor beside Krista's bed with his head and chest on the bed as Clark pulled Ehrich's arm behind his back. On Clark's instructions, she grabbed Krista and left Krista's room for the master bedroom in order to call the police. As she heard a continuing struggle coming from Krista's room, Mrs. Clark picked up a belt. After a few minutes she returned to that room to see what was happening. She saw Clark and Ehrich struggling, saw them crash into the bed and saw Clark push Ehrich into a window. Ehrich then ran into the master bedroom. Clark followed him and continued his attempts to subdue him until the police arrived.

Mrs. Clark also described Krista's trouble in falling asleep after Ehrich's intrusion. She stated she did not notice a smell of alcohol on Ehrich's breath at the time of his intrusion.

Psychologist Leon Jackson testified as to his interviews with and counseling of Krista. He stated the child suffered from an acute and severe post-traumatic stress disorder caused by her physical contact with Ehrich. When he interviewed her on July 9, 1986, she was very frightened by what had happened. During the first interview, Krista was very withdrawn and was curled in a fetal position. Mrs. Clark had to be present during the first 15 minutes of the interview. Jackson interviewed Krista a second time on July 17, 1986. At that time she had modified her description of the events of July 3 so as to remove herself from what had actually happened. Jackson stated this

was a normal defense mechanism. When asked about the prognosis for Krista, Jackson stated that even after periods of remission, certain situations would cause Krista's original feelings of anxiety, depression, and panic about her encounter with Ehrich to resurface.

Over defense objections, Jackson also described an interview of Brian Clark. He stated Brian also suffered trauma as a result of Ehrich's intrusion because he felt it was his responsibility to take care of his sister Krista, and he had not done so.

Lincoln police officer Michael Harberts, who arrested Ehrich at the Clark residence, stated he did not smell alcohol on Ehrich's breath at that time. He also testified Ehrich did not stumble or fall as he was taken from the Clark residence to the squad car.

Ehrich testified that on July 2, 1986, he was living in Elkhart with his grandmother. Around 9 or 10 a.m. he left Elkhart for Lincoln. He began walking because he did not have a car. He got a ride for part of the way, and arrived in Lincoln at about noon or 1 p.m. Ehrich first went to the Brew Tavern and had two or three beers. He then went to Madigan's Tavern and drank more beer. Then he went to the Blue Dog Tavern where he drank still more beer. During the afternoon he probably ate a sandwich and some popcorn.

Apparently toward evening, Ehrich left the Blue Dog Tavern and resumed drinking at yet another tavern, the name of which he could not remember. Upon leaving that tavern, he went to Mannie's. He recalled he was at Mannie's when the band started playing, and he drank more beer as well as shots of whiskey there. He did not remember leaving Mannie's. Ehrich estimated that on July 2, he drank 15 to 20 glasses of beer and an unknown number of shots of whiskey.

Ehrich had no recollection of being in the Clark home during the early morning hours of July 3, and he did not know any members of the Clark family. The next thing he remembered after drinking at Mannie's was awakening in a jail cell.

Lincoln police officer David Morrow also testified on Ehrich's behalf. He stated that on July 3, 1986, he responded to a call at the Clark residence. When he saw Ehrich at the Clark residence, he could detect a slight odor of alcohol on his breath.

Approximately 1½ to 2 hours before receiving the call to go to the Clark residence, Morrow, while on routine patrol, had seen Ehrich lying in a parking lot. Morrow stopped, thinking Ehrich needed assistance. Ehrich was unresponsive, and Morrow called an ambulance. At that time Morrow noticed a "small odor" of alcohol on Ehrich's breath. With coherent speech, Ehrich refused treatment by the paramedics and walked away from the parking lot. According to Morrow,

the paramedics broke an ammonia capsule under Ehrich's nose, presumably to revive him.

Ehrich's final witness was Dr. Carolyn Weyand, a clinical psychologist who examined Ehrich on January 16, 1987. Weyand concluded Ehrich has a condition similar to alcoholism. According to Weyand, Ehrich

"has serious emotional problems that are usually contained, but are expressed while [he] is intoxicated, and [a] history of having been in a lot of trouble with the law over many years, and somewhat depressed serious personality problems."

In Weyand's view, consumption of a large amount of alcohol by someone with Ehrich's profile would to a reasonable degree of psychological certainty eliminate that individual's ability to reason in a normal way and to control his psychological problems. She believed the consumption of a large amount of alcoholic beverages by Ehrich rendered him incapable of forming an intention to harm someone or steal something. In that condition, Ehrich could react but could not think and plan something. Weyand further opined the reasoning part of Ehrich's brain did not function when he drank large amounts of alcohol. She also stated Ehrich's entering a residence at 3 a.m. after having had a lot to drink would indicate he had regressed "to being like a small child looking for a home, or looking for a place that's safe and warm and comfortable to sleep probably."

According to Weyand, Ehrich's fighting back at Clark was consistent with her opinion with regard to his condition when under the influence of alcohol. She stated, "The fighting back is controlled by lower parts of the brain, not the reasoning parts, more the angry emotional parts, and would be a reacting response that a small child or an animal might respond with if attacked."

On cross-examination, Weyand stated in her view Ehrich suffers from paranoid psychosis and can become hostile and take aggressive actions when intoxicated. She acknowledged an intoxicated person's act of attempting to keep someone silent could be a reasoned decision. Weyand responded in the affirmative to a hypothetical question whether Ehrich, while intoxicated to the extent of being "blacked out," could enter a residence through a basement window and make his way through various rooms up to the bedrooms on the second floor of the house. She also testified that while the motor capacities of extremely intoxicated individuals are affected, such persons are not completely unable to move.

On the State's request, the court took judicial notice of Ehrich's previous burglary and felony theft convictions.

At the conclusion of the trial, the court found Ehrich guilty of both residential burglary and home invasion. Following a sentencing hearing, the court imposed sentences of 12 years' imprisonment for residential burglary and 16 years' imprisonment for home invasion.

Ehrich first contends the State did not disprove his affirmative defense of voluntary intoxication beyond a reasonable doubt. As the basis for this contention, Ehrich chiefly relies on (1) his testimony as to the large amount of alcohol he consumed on the day and evening preceding the incident at the Clark residence, (2) evidence concerning his behavior at the Clark home, including his inability to find his way out of the residence, and (3) Dr. Weyand's testimony that under the influence of a large amount of alcohol, a person with Ehrich's characteristics could not form the intent to harm anyone or plan anything.

The State argues Ehrich's decision to enter the Clark home, the complexity of his entry, and his attempting to silence Krista Clark after his detection all indicate his intoxication was not so extreme as to constitute a defense to the crimes with which he was charged. Therefore, the State contends the circuit court's decision the State rebutted Ehrich's affirmative defense of voluntary intoxication beyond a reasonable doubt was neither inherently implausible nor unreasonable.

■■ ■ Voluntary intoxication which negates the existence of a mental state which is an element of a crime is an affirmative defense. In order to constitute an affirmative defense, voluntary intoxication must be so extreme as to suspend all powers of reason. There are many levels of intoxication through which an individual may pass before he reaches the level at which he is incapable of forming the intent to commit a crime. If the evidence is sufficient to raise this affirmative defense, the State has the burden of rebutting it beyond a reasonable doubt by proving the defendant was aware of his actions at the time of the offense. (*People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 460 N.E.2d 60.) The weight to be accorded testimony relating to the defense of voluntary intoxication is peculiarly within the province of the trier of fact. *People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345.

■■ ■ In the present case, there is conflicting evidence as to whether Ehrich was so intoxicated during the relevant time period that he was incapable of forming an intent to commit the crimes of which he was convicted. On the one hand, Ehrich testified he remembered drinking at Mannie's Tavern on July 3, 1986, and the next thing he remembered was awakening in a jail cell on the following morning. Also, Dr. Weyand testified in her view the reasoning part of Ehrich's brain did not function when he drank large amounts of alcohol, and he

thus could not form the intent to harm someone or steal something at such times. However, Norman Clark stated he did not smell the odor of alcohol on Ehrich, Ehrich stated in a clear voice he was leaving the Clark residence, and Ehrich did not stumble while being led from the Clark home. Also, when Officer Morrow discovered Ehrich lying in a parking lot a comparatively short time before the incident at the Clark home, Ehrich stated in a coherent voice he did not desire treatment and then walked away from the scene. Finally, Ehrich discovered and crawled through a narrow opening in order to enter the Clark residence and had to take a rather circuitous route in order to arrive in the second-floor bedroom of Krista Clark. Once in Krista's bedroom, Ehrich attempted to restrain Krista and silence her.

In determining whether a defendant was so intoxicated that his power of reason was totally suspended, the trier of fact is not obligated to rely on the testimony of experts to the exclusion of lay testimony relevant to the defendant's degree of intoxication. Rather, the trier of fact may consider the opinions of experts together with all other evidence relevant to the defendant's mental state at the time of the alleged offenses and reject the expert testimony if it deems other evidence more credible. (See *People v. Jones* (1977), 56 Ill. App. 3d 600, 371 N.E.2d 1150.) In the present case, there is ample credible evidence on the basis of which the trier of fact could reasonably have concluded Ehrich was not so extremely intoxicated when he entered the Clark home that his power of reason was totally suspended. We find no error in the circuit court's implicit conclusion the State disproved Ehrich's affirmative defense of voluntary intoxication beyond a reasonable doubt.

■ Ehrich further argues he was not proved guilty of residential burglary beyond a reasonable doubt, because there is insufficient evidence he entered the Clark residence with the intent to commit a theft therein. He acknowledges proof of an unlawful breaking and entering ordinarily supports an inference of an intent to commit a theft absent inconsistent circumstances (*People v. Johnson* (1963), 28 Ill. 2d 441, 192 N.E.2d 864), but contends sufficient evidence was presented at his trial to take this case out of the general rule. He notes he had been drinking excessively on the afternoon and evening prior to his intrusion into the Clark residence, had been found passed out in a parking lot by a police officer, and bypassed much potential loot on the first floor of the Clark residence and instead proceeded to the second floor, which was much less likely to contain items of interest to a burglar. He further observes no items of personal property in the Clark residence which would have been of great interest to a burglar

were disturbed. Ehrich acknowledges he might have committed a burglary on the basis of entry with an intent to commit a felony other than theft in the Clark residence. He contends, however, he was not guilty of burglary on the basis of illegal entry with intent to commit a theft, which was the only variety of burglary with which he was charged.

The State contends Ehrich's presence on the second floor of the Clark residence is not inconsistent with an intent on his part to commit a theft. The State asserts the only light burning in the Clark residence when Ehrich entered it was on the second floor, and it was therefore reasonable to presume Ehrich might not have seen any valuable items on the first floor and proceeded to the second floor in order to see if anyone was home. The State observes Ehrich did not know the Clarks and argues Ehrich's restraint of Krista was not inconsistent with an intent on his part to prevent further detection during a theft. For these reasons, the State contends circumstances inconsistent with an intent to commit a theft are not present in this case, and Ehrich's conviction of burglary on the basis of his illegal entry into the Clark residence and the inferences flowing therefrom should be affirmed.

Residential burglary is committed when one knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft. (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a).) The general rule with respect to the inference of an intent to commit a theft on the basis of an unlawful breaking and entering is well settled:

> "Intent must ordinarily be proved circumstantially, by inferences drawn from conduct appraised in its factual environment. *** [I]n the absence of inconsistent circumstances, proof of unlawful breaking and entry into a building which contains personal property that could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary. Like other inferences, this one is grounded in human experience, which justifies the assumption that the unlawful entry was not purposeless, and, in the absence of other proof, indicates theft as the most likely purpose." *Johnson*, 28 Ill. 2d at 443, 192 N.E.2d at 866.

Initially we note it is not clear a light was burning in the Clark residence when Ehrich entered it. Clark replied in the negative to a general question as to whether any lights were on. He did state a fluorescent light was on when he entered Krista's room after hearing her screaming, but did not state whether that light had been on since

Krista had gone to bed that night. On the basis of this equivocal evidence, we cannot say the possibility of a light burning on the second floor of the Clark residence when Ehrich entered it supports the inference he entered the residence with an intent to commit a theft.

Aside from the possibility there may have been a light burning on the second floor of the Clark residence when Ehrich entered it, the State points to no evidence which would support a conclusion Ehrich entered the Clark home with the intent to commit a theft therein. To the contrary, there are several circumstances inconsistent with an intent on the part of Ehrich to commit a theft when he entered the Clark residence. Ehrich had been drinking most of the previous day and evening. Although he was not so extremely intoxicated that he was incapable of forming the intent to commit a criminal offense, he must nevertheless have been intoxicated at the conclusion of his drinking spree. He was at least 10 miles away from his home in Elkhart and had no means of transportation back to Elkhart. Under these circumstances, Ehrich may have had a strong desire to find a place to sleep, as is evidenced by Officer Morrow's finding him asleep in a parking lot. Ehrich may have entered the Clark residence with the intent of finding a place to sleep. Since Ehrich was discovered seated on Krista Clark's bed with his arms around her, we might infer he entered the Clark residence with the intention of sexually abusing any female whom he might discover in the residence. Ehrich was, however, charged with residential burglary only on the basis he entered the Clark home with the intent to commit a theft, and he was tried on that theory alone.

Because there are circumstances inconsistent with an intent on the part of Ehrich to commit a theft when he entered the Clark residence, the presumption of intent to commit a theft which normally flows from an unexplained breaking and entering is inapplicable to this case. (*Cf. People v. Perry* (1971), 133 Ill. App. 2d 230, 272 N.E.2d 766 (defendant's discovery in part of house other than that in which objects of theft would most likely have been found, coupled with prior invitations to defendant to pay late night visits to house in which he was discovered, raised inference of some motive other than theft for defendant's presence in house and required reversal of defendant's burglary conviction).) Since the evidence does not establish beyond a reasonable doubt the commission of a theft was uppermost in Ehrich's mind when he entered the Clark residence, we must reverse Ehrich's residential burglary conviction.

Ehrich also contends that he was not proved guilty of home invasion beyond a reasonable doubt. Section 12—11 of the Criminal

Code of 1961 provides in pertinent part:

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and

(1) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or

(2) Intentionally causes any injury to any person or persons within such dwelling place." (Ill. Rev. Stat. 1985, ch. 38, par. 12–11.)

Ehrich asserts emotional trauma does not constitute an "injury" for purposes of the above statute, and argues instead there must be evidence of some type of pain or physical harm to the body of the victim in order for there to be an "injury" within the meaning of the statute defining home invasion. He also asserts the circuit court found him guilty of home invasion on the basis he caused physical injury to Krista Clark, while he was charged and the case was tried on the theory the only injury he caused Krista was emotional trauma.

The State argues the language of the home invasion statute establishes the injury necessary to support a home invasion conviction is not limited to physical injury but instead includes psychological trauma. The State also maintains the circuit court did not find Ehrich guilty of home invasion on the basis he physically injured Krista Clark. The State acknowledges the court stated Ehrich's physical contact with Krista might have been sufficient to establish Ehrich's guilt had the State elected to proceed on a physical injury theory, but asserts the court based its decision solely on psychological injury resulting from Ehrich's physical contact with Krista.

Ehrich's contention he was convicted on a theory of home invasion different from that on which he was charged and tried is utterly lacking in merit. In finding Ehrich guilty of home invasion, the circuit court stated:

"I think there was harm caused here, and as set forth in *People v. Foster* [(1982), 103 Ill. App. 3d 372, 431 N.E.2d 430] case, in order to establish bodily harm in a battery case there's not any requisite showing, or does not need to be visible injury such as bruising, or scratching, bleeding. In the instant case, in Mr. Ehrich's case, he did have his hands over this young girl's mouth and was restraining her in her own bedroom. I think

that that would show a requisite contact and injury. *The psychological injury resulting from that I think does constitute the offense necessary for this home invasion to be proven also beyond a reasonable doubt.*" (Emphasis added.)

The above statement makes it clear that in finding Ehrich guilty of home invasion, the circuit court considered his physical contact with Krista only insofar as it was the cause of the psychological trauma which Krista suffered. There is no basis for Ehrich's contention the circuit court found him guilty of home invasion on the basis he physically injured Krista.

█ We also find no merit in Ehrich's contention psychological trauma may not form the basis for a home invasion conviction. The home invasion statute provides one of the alternative elements of the offense is "any injury" to persons in a dwelling. However, other statutes defining criminal offenses require either "physical injury," "physical harm," or "bodily harm," or threats to inflict such, before criminal liability attaches. (*E.g.*, Ill. Rev. Stat. 1985, ch. 38, pars. 12—3(a)(1), 12—4(a), 12—4(b)(10), 12—4.3(a), 12—6(a)(1), 12—6.1, 12—7(a), 12—9(a)(1), 12—14(a)(2); Ill. Rev. Stat., 1986 Supp., ch. 38, pars. 12—3.1(a), 12—4.4(a).) In using broader language to describe the type of injury which results in liability under the home invasion statute than to describe the type of injury or threatened injury which results in liability under other statutes defining criminal offenses, the legislature obviously intended a range of injuries broader than only physical or bodily harm result in criminal liability under the home invasion statute. For this reason, and because "the subjective pain of mental injury often exceeds that of physical injury, and the tangible scars may be as lasting" (*People v. Jackson* (1984), 122 Ill. App. 3d 166, 170, 460 N.E.2d 904, 907), we conclude psychological trauma constitutes an injury for purposes of the home invasion statute.

None of the authorities relied upon by Ehrich directly refute our conclusion emotional trauma is an injury within the meaning of the statute defining home invasion. In *People v. Garza* (1984), 125 Ill. App. 3d 182, 465 N.E.2d 595, *People v. Rachel* (1984), 123 Ill. App. 3d 600, 462 N.E.2d 959, *People v. Foster* (1982), 103 Ill. App. 3d 372, 431 N.E.2d 430, and *People v. Bitner* (1980), 89 Ill. App. 3d 1106, 412 N.E.2d 721, the State apparently did not argue emotional trauma constitutes an injury within the meaning of the statute defining home invasion. In *People v. Geitz* (1985), 138 Ill. App. 3d 670, 485 N.E.2d 1349, the State did advance that argument, but the court merely held the defendant inflicted "injury" on the victim within the meaning of the statute; thereby avoiding the necessity of deciding whether psy-

chological trauma constitutes an injury for purposes of the statute defining home invasion.

The *Garza* court, in holding rape is not a lesser included offense of home invasion, did state injury, for purposes of the home invasion statute, necessarily connotes physical injury, *i.e.*, pain or damage to the body. However, the real basis for the court's decision on the lesser included offense question was no evidence of physical injury is required to support a rape conviction. Thus home invasion does not include all of the elements of rape. However, emotional trauma to the victim also is not necessary to support a rape conviction. Since neither emotional nor physical injury is an element of the offense of rape, the *Garza* court's statement "injury," for purposes of the home invasion statute, means *physical* injury was *dicta*.

In *Bitner*, the Third District of this court, in holding battery is a lesser included offense of home invasion, stated to cause an injury within the meaning of the home invasion statute, one must cause bodily harm. However, the *Bitner* court was not confronted with a situation in which a home invasion caused severe and possibly long lasting emotional trauma to a young child. For the above reasons, *Garza* and *Bitner* are not persuasive authority for Ehrich's contention psychological trauma is not an injury for purposes of the statute which defines the offense of home invasion.

■ Ehrich finally argues he is entitled to reversal of the 16-year prison sentence imposed upon him for home invasion and to a new sentencing hearing with respect to that offense. The basis for this contention is the circuit court's purported consideration of the fact the home invasion caused harm to others as an aggravating factor in determining Ehrich's sentence. Ehrich notes harm to others was an inherent element of the home invasion of which he was convicted.

The State initially argues this matter has been waived because it was not brought to the circuit court's attention at Ehrich's sentencing hearing. On the merits, the State argues harm to others caused by Ehrich's invasion of the Clark residence was properly considered by the circuit court in imposing sentence. In support of this contention, the State asserts the circuit court may consider psychological injury to the victim as an aggravating factor in imposing sentence, and may also consider the nature and circumstances of the offense and the extent, degree or nature of the threat, risk or actual harm caused by the offense, "regardless of whether the offense itself deals with harm." Finally, the State contends if the circuit court did indeed consider an improper factor in imposing sentence, it is apparent from the record Ehrich's sentence for home invasion would not have been dif-

ferent had such a factor not been considered.

At Ehrich's sentencing hearing, the State's Attorney argued the home invasion which Ehrich committed caused "harm to the victim." In support of this argument, the State's Attorney mentioned the post-traumatic stress disorder which Krista Clark suffered, and which could later reoccur after subsiding for a time. He also noted Brian Clark continued to feel badly as a result of not coming to Krista's defense during the incident, and after Ehrich's intrusion Brian slept with knives on his night stand and a baseball bat leaning against the wall at the head of his bed. Also, after noting Ehrich's prior felony convictions and the classification of home invasion as a Class X felony, the State's Attorney again maintained Ehrich's actions caused psychological injury to Krista and asserted Ehrich's home invasion placed "the whole [Clark] family at risk in a violent confrontation as the father attempted to protect his daughter in a long and what was a difficult and violent struggle." Ehrich's counsel did not specifically respond to the above portions of the State's Attorney's argument.

By failing to specifically respond to the State's Attorney's argument concerning the harm caused by the offense he committed, Ehrich waived his contention the circuit court improperly considered this matter in imposing sentence. (*People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592.) The present case is distinguishable from *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, where the court held the defendant did not waive the same contention because, *inter alia*, defense counsel presented argument concerning harm to the victim as an aggravating factor prior to the trial court imposing sentence. Even if Ehrich had not waived this contention, the circuit court's reliance on the harm caused by his conduct as a basis for imposing sentence would not, under the circumstances of this case, require reversal of his sentence.

In imposing sentence upon Ehrich, the circuit court stated:

"One of the things that does stand out in this particular case in my mind when I read over the reports is that you are twenty-six years old and you already stand convicted from the report here of three separate felony convictions. There's a burglary in 1981, another burglary in 1982, and a theft over three hundred dollar conviction in 1982. You have previously been sent to the Illinois Department of Corrections.

In this particular case, the Court is of the opinion that this is a serious matter, there was serious harm caused to others, and it is necessary for the protection of the public that you be incarcerated, and the legislature has mandated the incarcera-

tion.

\* \* \*

After considering all of the factors set forth in Section 1005—4—1 of Chapter 38, also considering the evidence offered in aggravation and mitigation in this particular offense, the Court is going to sentence Jeffrey P. Ehrich, the Defendant in this particular case, to a term of incarceration in the Illinois Department of Corrections on the home invasion charge of sixteen years in the Illinois Department of Corrections.

\* \* \*

This is a number of years. You've caused in my opinion great harm to Mr. and Mrs. Clark and to their family. There are some things that they're going to have to live with, just like you're going to have to live with."

■ The circuit court may consider as an aggravating factor in determining the length of sentence to impose the degree of harm caused the victims, even where serious bodily harm is arguably implicit in the offense of which a defendant was found guilty. The court may not, however, consider as an aggravating factor the end result of the defendant's conduct, where the end result is implicit in the offense as to which sentence is imposed. For instance, the court may not consider the victim's death where the defendant is sentenced for the offense of voluntary manslaughter. *Saldivar*, 113 Ill. 2d 256, 497 N.E.2d 1138.

■ Under the language of the applicable statute, the intentional causation of even a slight physical injury is sufficient to support a home invasion conviction. Not all home invasions involve the infliction upon young children of serious psychological trauma which may continue to affect them long after the incident. Since the home invasion which Ehrich committed caused harm which is not the end result of all home invasions, the circuit court did not err in considering the harm caused by Ehrich's invasion of the Clark home as an aggravating factor in imposing sentence.

Ehrich's residential burglary conviction is reversed; his home invasion conviction is affirmed.

Affirmed in part; reversed in part.

GREEN, P.J., and SPITZ, J., concur.