THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE CURTIS BRADNEY, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LINDA BRADNEY, Defendant-Appellant.

Fourth District Nos. 4—87—0092, 4—87—0176 cons.

Opinion filed May 19, 1988.—Rehearing denied July 19, 1988.

842

McCULLOUGH, J., concurring in part and dissenting in part.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellants.

Charles H. Burch, State's Attorney, of Hardin (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a bench trial, the defendants, Bruce C. Bradney (Bruce) and Linda Bradney (Linda), were convicted of residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3) and theft over $300 (Ill. Rev. Stat. 1985, ch. 38, par. 16—1). They appeal, contending: (1) evidence concerning the recovery of various items of stolen property from Linda Bradney's automobile should have been suppressed because the stolen property was not seized pursuant to a search warrant or as part of a valid inventory search; (2) the State did not disprove their affirmative defense of voluntary intoxication beyond a reasonable doubt; (3) the results of electrophoretic analysis of dried bloodstains found at the scene of the offenses and in Linda Bradney's automobile were improperly admitted; (4) the State did not establish an adequate foundation for testimony concerning the frequency of blood characteristics in the general population; (5) the State did not establish a proper chain of custody for blood specimens drawn from the defendants; (6) in imposing sentence, the circuit court did not give proper consideration to various mitigating factors; and (7) they are each entitled to 592 days of sentence credit for the time they were incarcerated after their arrests and prior to being sentenced for the present offenses.

The victims of the offenses of which the Bradneys were convicted were Ralph and Genevieve Moses, who reside in a rural area of Calhoun County near Golden Eagle. Upon returning home at approximately 8:30 p.m. on the evening of June 8, 1985, after spending the afternoon and early evening in Alton, the Moses discovered their home had been burglarized. On the following day, Ralph Moses talked with neighbors and discovered that during the previous afternoon, an unfamiliar brown automobile had been seen on both the Moses' property and on the nearby property of Marvin Gelber. It was determined that automobile belonged to Linda Bradney. On the basis of this information, Linda's automobile was seized in Alton on June 10, 1985. Discovered in Linda's automobile was personal property which had been

stolen from the Moses' residence. Marvin Gelber made an in-court identification of the Bradneys as the occupants of the unfamiliar brown vehicle. The above evidence, together with evidence supporting an inference bloodstains found in the Moses' residence on the evening of the burglary may have consisted of Bruce's blood, constituted the principal links in the chain of circumstantial evidence which the State presented in support of the charges against the Bradneys. Additional evidence pertinent to the issues presented for review will be set out in relevant portions of this opinion.

## I. Search of Automobile

■ As a preliminary matter, we note in determining whether the circuit court properly ruled upon the Bradneys' motion to suppress evidence, we may consider evidence presented at their trial, in addition to that presented at the hearing on their motion to suppress. (*People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808.) In view of our decision with respect to this issue, the evidence introduced at the Bradneys' bench trial is of greater relevance than that introduced at the hearing on their motion to suppress evidence.

At the Bradneys' bench trial, Mary Ellen Freidel testified she is related by marriage to the Moses, and lives about a half-mile down the road from the Moses' residence. On June 8, 1985, she and two of her small children left their home at about 4:30 p.m., in order to go to church in Grafton. On their way to Grafton they passed the Moses' residence and noticed a car backed into the Moses' driveway. The car was parked at a point closer to the Moses' residence than guests of the Moses normally park. The back of the car was open. Freidel described the automobile as "a small, brown, older model car." Upon hearing of the burglary of the Moses' residence on the following morning, Freidel supplied Genevieve Moses with information concerning the vehicle which she had seen in their driveway on the previous afternoon.

On cross-examination, Freidel stated she did not immediately call the police when she saw the car in the Moses' driveway because she at first thought it belonged to one of the Moses' grown children. She acknowledged the brown car could have been in the Moses' driveway for some reason other than the burglary, and the burglary of the Moses' residence could have occurred before or after she saw the brown car in the Moses' driveway.

Marvin Gelber, a resident of Creve Coeur, Missouri, testified he owns a farm about 1½ miles from the Moses' residence. Gelber was at his farm on the afternoon of June 8, 1985. At approximately 3:45

or 4 p.m. on that afternoon, one of his workmen called Gelber's attention to the presence of strangers on his property. Gelber proceeded to the entrance of his farm, where there is a small, white four-room house which was at that time unoccupied. There he saw a light brown two-door Pinto hatchback automobile. Also present were a white woman with straight dishwater-blond hair and a white man with a small thin mustache. Gelber inquired what they were doing there, and they replied they wanted to rent the white house. Gelber stated the house was not for rent and said there was no "for rent" sign, but the couple insisted they wanted to rent the white house. Gelber thought this was odd, and jotted down the license plate number of the brown automobile as it was backing up. On the following day, Gelber informed Ralph Moses of the previous day's incident involving the strangers on his property, and also provided Moses with the license plate number of the brown Pinto automobile which had been on his property on the previous day. Gelber made an in-court identification of the Bradneys as the strangers he had seen on his property on the afternoon of June 8, 1985.

Ralph Moses testified that on the day following the burglary of his residence—June 9, 1985—he was informed Mary Ellen Freidel had seen a car in the Moses' driveway between 4:30 and 5 p.m. on the previous day. He subsequently talked with Freidel. He also talked with Gelber, and Gelber gave him the license number of the brown car he had seen on his property on the previous day. After obtaining the license plate number from Gelber, Moses called the Calhoun County sheriff's department and requested a check be run on that number.

Calhoun County sheriff Richard Meyer testified the license plate number which Gelber wrote down and which Moses relayed to the sheriff's department was for a vehicle registered in the name of Linda Bradney. On June 10, 1985, Meyer turned that information over to the Alton police department because the "[l]icense plate number come back [*sic*] to Alton area."

Detective Sergeant Raymond H. Galloway of the Alton police department testified on the basis of information the Bradneys were wanted by the Calhoun County and Madison County sheriff's departments, he, on June 10, 1985, issued a dispatch to the effect the Bradneys were to be arrested. The Bradneys were arrested on the same day, and their Ford Pinto automobile was towed to the Alton police department.

Sergeant Don Lovell of the Alton police department testified that on June 10, 1985, he received information from Sergeant Galloway the police were seeking a brown Pinto hatchback automobile, and

Bruce and Linda Bradney were being sought with reference to that automobile. Lovell kept the Bradneys' automobile under surveillance for a brief period of time, observed the Bradneys enter the vehicle, and followed the Bradneys for several blocks. He was preparing to stop the Bradneys when they pulled over.

When the Bradneys exited their vehicle, Sergeant Lovell placed them under arrest. He transported Linda to the police station, and another officer transported Bruce Bradney to the station. Linda Bradney's automobile was towed to the police station and secured in the basement garage.

Mary Ellen Freidel further testified that on June 10, 1985, Trooper Thomas Jacobs transported her to the Alton police department, where she identified a vehicle which she saw in the police garage as that which she had seen at the Moses' residence on the afternoon of June 8, 1985.

Sheriff Meyer stated he was present while items were removed from the Bradneys' vehicle at the Alton police department. He thought Ralph Moses identified items as they were removed from the vehicle.

Ralph Moses testified that on June 10, 1985, he was summoned to the Alton police department, where he was met by Sheriff Meyer, Sergeant Galloway, and another officer with whom he was not familiar. At the police department, Moses saw a brown Ford hatchback automobile bearing the license number which Gelber had provided him. While Moses was at the police department, the brown Pinto hatchback was searched by Galloway, assisted by an individual whom Moses did not know. Among the items discovered in the automobile were cameras, jewelry boxes, and binoculars which were among the items missing from the Moses' residence. The car also contained items which did not belong to the Moses.

On cross-examination, Moses testified before Linda Bradney's automobile was opened, one could see duffel bags and a suitcase, which were closed, through the glass. As items were removed from the car's hatchback, Moses looked at them and identified some items as being his.

Trooper Thomas F. Jacobs of the Illinois State Police stated that on June 10, 1985, he transported Mary Freidel and her small daughter to the Alton police station to enable them to identify a vehicle which the Alton police department had impounded. The impounded automobile was a light brown 1975 Ford Pinto. Freidel identified that vehicle in Jacobs' presence. Jacobs personally viewed the vehicle and observed one suitcase and two bags in the vehicle's back compart-

ment. These articles were still in the vehicle when Mary Freidel identified it. Jacobs further testified that after Freidel identified the vehicle, Ralph Moses looked into the automobile's back glass, hesitated a moment, saw a brown suitcase in the back of the vehicle, and said, "Hey, that looks like my suitcase." Sergeant Galloway opened the vehicle so Moses could get a better look at it, and Moses said, "That's my suitcase." Galloway then opened a bag, and a camera was immediately exposed. Ralph Moses said, "[T]here's my camera."

Sergeant Galloway testified that when Linda Bradney's vehicle was brought to the police department, he, Sergeant Lovell, Sheriff Meyer, and Officer Hickman were present. Mary Freidel and her daughter arrived later. Galloway was present when the Freidels examined Linda Bradney's car and identified it. According to Galloway, Linda Bradney's vehicle was a hatchback, and one could see into the large rear back window very plainly. Ralph Moses looked into the vehicle's rear window and said, "[T]hat looks like my suitcase." At that time, Moses was not able to see any of the items inside the suitcase. Galloway then proceeded to open the suitcase and duffel bags which were in the rear section of Linda Bradney's vehicle. Upon Galloway opening one of the duffel bags, Moses stated, "[T]hat's my camera." Galloway then took the articles found in Linda Bradney's automobile to an investigation room, where he "inventoried the items out on the table." Galloway removed the suitcase and duffel bags from Linda's vehicle because, "I had merchandise taken from the Calhoun County burglary."

Elmer Hickman, a patrolman with the Alton police department, testified he accompanied Linda Bradney's vehicle from the location of its seizure to the Alton station. When he turned the vehicle over to Sergeant Galloway in the basement of the police station, it contained suitcases, duffel bags and other items.

On August 9 and 13, 1985, Bruce and Linda Bradney filed motions to exclude evidence, in which they alleged their constitutional rights under the United States and Illinois Constitutions were violated by a wrongful seizure of their persons and Linda's automobile. At the hearing on these motions, the State contended the Bradneys were properly arrested and Linda's automobile was properly seized on the basis of probable cause to believe the Bradneys were guilty of residential burglary. The State further argued Linda Bradney's automobile was searched as a result of an inventory of the vehicle and pursuant to a lawful arrest. The Bradneys' attorneys argued the removal of items from Linda's automobile constituted an illegal search and seizure as opposed to a valid inventory search. They further argued (1)

the search of Linda Bradney's automobile was not incident to an arrest, (2) no exigent circumstances which would have justified a warrantless search, such as the imminent destruction of evidence, were present, and (3) the plain view doctrine was inapplicable because there was no way of knowing what was in the duffel bags until the contents thereof were examined.

In its order denying the Bradneys' motions to exclude evidence concerning the items found in Linda's automobile, the circuit court found a search and inventory of the vehicle was performed without the benefit of a search warrant. The court further found two duffel bags and a suitcase were in plain view through the hatchback window of Linda's automobile, and Sergeant Galloway indicated Ralph Moses spotted a suitcase which Moses thought belonged to him. Relying on the facts the Bradneys were properly arrested for burglaries in Calhoun and Madison Counties, and two duffel bags containing unknown articles together with a suitcase at least tentatively identified by a victim were visible in the back of Linda Bradney's automobile, the court concluded the police had reasonable grounds to believe Linda's vehicle contained the fruits of a burglary committed in Calhoun County. Relying on *United States v. Ross* (1982), 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157, the court held the fact the stolen property was recovered from containers was immaterial. The court further held the fact the search was not conducted immediately upon seizure of Linda's automobile was of no consequence in view of the Supreme Court's decision in *United States v. Johns* (1985), 469 U.S. 478, 83 L. Ed. 2d 890, 105 S. Ct. 881. Also, the court held Linda's automobile was properly searched as a result of an inventory of the items contained in the vehicle.

On July 15 and 16, 1986, Bruce and Linda filed motions for reconsideration of the circuit court's decision with respect to the admissibility of evidence concerning the items found in Linda's automobile. The basis for this motion was some of the law enforcement officers who testified for the State in the present case testified at a Madison County trial involving the Bradneys to the effect no inventory search of Linda's automobile was performed at the Alton police department on June 10, 1985. At a hearing on these motions, the State's and the Bradneys' arguments centered on the question of whether the June 10, 1985, search of Linda's automobile was a valid inventory search. The court denied these motions, holding an inventory search of Linda's vehicle was performed on June 10, 1985. The court also noted, with respect to its ruling on the Bradneys' previous motions to exclude evidence, "the inventory rationale was not the only reason for

not suppressing the seizure," and found "the arresting officers had information which would lead them to reasonably believe that [Linda's] vehicle was transporting contraband."

The arguments of both the Bradneys and the State as to the question of whether the circuit court should have suppressed evidence stolen property was discovered during the search of Linda's automobile concentrate on the issue of whether the items stolen from the Moses' residence were discovered during a valid inventory search of Linda's vehicle. Additionally, the State contends Linda's automobile was properly seized, since at the time the automobile was impounded, the Bradneys were suspects in residential burglaries. The State also argues a search warrant for the Bradney's automobile could not have been obtained since it was not certain it contained stolen items (the burglary having occurred two days earlier), and the police thus could not have stated with specificity the items for which they would be searching. In their reply argument, the Bradneys contend the Moses could easily have described the items missing from their home with sufficient specificity to enable them to be listed on a valid search warrant.

■■ Although the focus was on the issue of whether the police performed a proper inventory search of Linda's vehicle, we believe the question of whether the police had probable cause to believe Linda's vehicle contained stolen property was sufficiently presented in the circuit court proceedings to enable us to consider that issue on appeal. We conclude the police properly searched Linda's automobile on the basis of probable cause to believe it contained stolen property. Therefore, we need not consider whether the police performed a valid inventory search of Linda's vehicle. Also, since the Bradneys did not in their opening brief assert the initial seizure of Linda's vehicle violated their constitutional rights, we need not consider whether the police acted properly in seizing Linda's vehicle before it was towed to the Alton police station. See 107 Ill. 2d R. 341(e)(7) (points not argued in appellant's opening brief are waived).

■■ Observation of that which is in plain view does not constitute a search. (*People v. Davis* (1965), 33 Ill. 2d 134, 210 N.E.2d 530.) The viewing of items contained in an automobile from a location at which the person observing the objects has a lawful right to be is not a search of the vehicle. *People v. Exum* (1943), 382 Ill. 204, 47 N.E.2d 56.

■■ Probable cause for a search exists where, on the basis of all known circumstances, "there is a fair probability that contraband or other evidence of a crime will be found in a particular place." (*Illinois*

*v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.) Once the police have probable cause to believe an automobile contains contraband or stolen property, they may search any containers found in areas of the vehicle which they have probable cause to believe may contain contraband or stolen property. (*United States v. Ross* (1982), 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157; *United States v. Caroline* (D.C. Cir. 1986), 791 F.2d 197.) Some Federal courts have limited the *Ross* decision to the extent police may not search an entire vehicle if they have probable cause to believe only a specific container within the vehicle holds contraband and have no basis for believing a search of other areas of the vehicle may turn up contraband. In such situations, a warrant is required in order to search the suspect container. (*E.g., United States v. Williams* (D.C. Cir. 1987), 822 F.2d 1174; *United States v. Mazzone* (7th Cir. 1986), 782 F.2d 757, *cert. denied* (1986), 479 U.S. 838, 93 L. Ed. 2d 84, 107 S. Ct. 141.) If the police have probable cause to believe an area of an automobile contains contraband or stolen property, the fact they focus their search on a specific container or containers found within that area is of no consequence. *McKinney v. State* (1987), 184 Ga. App. 607, 362 S.E.2d 65.

▪ A search of a properly seized automobile premised on probable cause to believe it contains contraband need not occur immediately upon seizure of the vehicle. Rather, the police may remove the automobile from the scene of its seizure and search it and closed containers found therein at a different location. *United States v. Johns* (1985), 469 U.S. 478, 83 L. Ed. 2d 890, 105 S. Ct. 881; *United States v. Weber* (11th Cir. 1987), 808 F.2d 1422.

In the present case, Mary Freidel identified Linda Bradney's automobile as the vehicle which she saw at the Moses' residence on the day it was burglarized. Additionally, law enforcement officers were aware Marvin Gelber had on the day of the burglary seen the same vehicle on his property, which is located near the Moses' residence, under highly suspicious circumstances.

Ralph Moses did not testify he identified a suitcase in Linda Bradney's automobile as belonging to him before the vehicle was searched. Nevertheless, both Detective Galloway and Trooper Jacobs testified Ralph Moses (while looking into Linda Bradney's automobile from a vantage point at which he had a lawful right to be) made a statement to the effect, "[T]hat looks like my suitcase" before the police searched the vehicle. The circuit court specifically relied upon this uncontroverted facet of Sergeant Galloway's testimony in holding the police had reasonable grounds to believe Linda Bradney's automobile

contained fruits of a crime prior to searching it. This portion of Sergeant Galloway's testimony is corroborated by the testimony of Trooper Jacobs of the Illinois State Police. Trooper Jacobs' only role in the investigation of the burglary of the Moses' residence was to transport Mary Freidel and her daughter from their Calhoun County home to the Alton police department and back, so they could view Linda Bradney's vehicle at a time when the Calhoun County sheriff's department was apparently shorthanded. Thus Jacobs was for practical purposes an unbiased and impartial witness to the events leading up to the search of Linda Bradney's automobile.

■ Because Ralph Moses tentatively identified a suitcase in Linda Bradney's automobile as belonging to him and the vehicle had been seen in proximity to the time and place of the burglary of the Moses' residence, the police had probable cause to believe property stolen from the Moses' residence was located throughout Linda's automobile and to search any containers which they found in the vehicle, including the duffel bags in which property stolen from the Moses' residence was discovered (see *Mazzone*, 782 F.2d 757 (police who observed what they believed were drugs being handed to occupants of van and car had probable cause to believe searches of all areas of those vehicles might turn up additional drugs, drug paraphernalia or proceeds of other drug sales)). For the above reasons, we hold the circuit court properly denied the Bradneys' motions to suppress the evidence property stolen from the Moses' residence was found in Linda Bradney's automobile.

## II. VOLUNTARY INTOXICATION

At the Bradneys' trial, Bruce Bradney testified he began using alcohol at the age of 16. He failed ninth grade because of alcohol usage. As a teenager, he used alcohol as often as he could get people to supply it. Bruce also outlined his drug usage, which began with the inhalation of Benzedrine in 1957 while in the military. At that time Bruce discovered by swallowing inhalers he could consume large quantities of alcohol over a two- to three-day period. When stationed in Germany he took Preludin, a drug which was then legal and cost 35 cents for 20 pills. He stated Preludin is a derivative of Benzedrine and is a powerful amphetamine. While in the ambulance service at Fort Dix he had ample supplies of alcohol and received amphetamines from the Army hospital. At that time Bruce "started soaking them [nasal inhalers] down and injecting them into [his] arms." As a result Bruce has practically no circulatory system left. During his military service, Bruce suffered from memory loss following overindulgence in alcohol

and drugs. He has experimented with heroine, cocaine and morphine.

Bruce further testified that on May 29, 1985, he was released from Menard Correctional Center, and Linda drove him to Alton. En route they stopped at a bar near the prison and had "a couple of drinks and bought a six-pack of bottles." From that date through June 8, 1985, Bruce drank and consumed alcohol on a daily basis. At first he only intended to celebrate his release from prison with Linda and their landlady in Alton. However, on the morning following his release, he discovered Linda had just been denied early release from parole. As a result, the couple would have to remain in Madison County instead of moving to Iron Mountain, Missouri, in order to start a new life as they had planned. In Madison County, "people *** were not particularly happy with us to begin with *** I knew that it would be just a matter of time before they would find some reason to throw me in jail like they did before. The more I thought about it the more I drank. The more I drank the more I wanted some pills."

Bruce also injected drugs during the period between his release from prison and June 8, 1985, and his house and Linda's car were full of used syringes. Bruce had no memory concerning where he was or what he did on June 8, 1985. Bruce had $500 upon his release from prison, but upon his arrest had only $8 or $9, and Linda had $13.

Linda testified she began drinking at the age of 12 and as a child became intoxicated two to three times per week. She "did uppers and downers" during that time. She first began experiencing blackouts or memory losses as a result of intoxication while a teenager. As an adult she could "drink two or three quarts of Mad Dog 20/20 [Mogan David 40-proof wine]." She further stated she could drink "up to a case and half of beer by [herself]." She drank heavily when she was depressed.

Linda stated that on May 29, 1985, she drove to Menard Correctional Center to pick up Bruce. She brought two six-packs of beer with her, and they stopped on the way home to buy Mad Dog wine. From then until June 8, 1985, she consumed alcohol in the form of Southern Comfort, Mad Dog wine, beer, gin, and rum, and became intoxicated on a daily basis. She also consumed Placidyl and Valium pills during the same period. Linda stated she has no present memory of what happened on June 8, 1985.

On cross-examination, Linda stated she remembered last consuming drugs and alcohol on May 30, 1985. When asked whether she recalled consuming any drugs or alcohol after that date, she replied, "[O]nly my apartment when I woke up is nothing but beer cans and empty wine bottles."

The Bradneys also presented an evidentiary deposition of Dr. Robert Carroll, a physician specializing in neuropsychiatry. Approximately 10% to 20% of Dr. Carroll's practice is devoted to alcohol and drug treatment.

Carroll testified as to the effects of alcohol and Valium on the human mind and body. He was then asked hypothetical questions concerning a hypothetical man possessing Bruce's characteristics, who had consumed the amount of alcohol Bruce claimed to have consumed during the 10-day period preceding and including June 8, 1985. When asked whether, at the tail end of such a drinking spree, the hypothetical man's ability to reason would be impaired, Carroll responded:

"I would say that his ability to reason would be impaired, although, all functions of, all brain functions, may not be impaired; for instance, he may be able to walk, talk, communicate with others, drive a car, appear conscience [sic]. Other brain functions, personality functions could be impaired such as judgment, emotion, level of provocation, value system, inhabitions [sic]."

Carroll was next questioned concerning a hypothetical woman who consumed the amount of alcohol and drugs Linda claimed to have consumed during the 10-day period preceding and including June 8, 1985. Carroll implied his answers would be similar to those he gave for the hypothetical man having Bruce's characteristics. The following dialogue then occurred:

"Q. *** [C]ould this hypothetical woman distinguish between what's right and what's wrong?

A. It's quite likely that the function would and could be impaired. I mentioned a hypothetical man that not only would and could [sic] her own inhabitions [sic] and her own value system be impaired, but also her awareness of and/or her appreciation and, and her taking into account of other people's and society's value systems be impaired. In other words, the consequences of her acts and her appreciation could be (inaudible); and the likewise (inaudible) at that level of chemical effect on her nervous system to do such a thing."

The Bradneys contend as a result of their voluntary intoxication on June 8, 1985, they were unable to form the requisite intent to burglarize the Moses' residence, and the State did not present sufficient evidence to rebut the evidence of voluntary intoxication which they presented. The Bradneys place particular reliance on the testimony of Dr. Carroll, which they contend establishes they were so drugged and intoxicated on the date in question they were incapable of forming a

mental intent to commit residential burglary and theft. They also rely on their own testimony as to their prior history of alcohol and drug addiction and their testimony that beginning May 29, 1985, they began drinking and taking drugs on a daily basis until June 10, 1985. They also note they both testified they suffered from memory loss for about the first 10 days of June 1985.

The State contends the Bradneys' actions on the date of the burglary of the Moses' residence are inconsistent with a conclusion their ability to reason was totally suspended when they burglarized the Moses' residence. The State notes the Bradneys were able to quickly formulate an alibi for their presence on Gelber's property and backed up Linda's automobile close to a stranger's house and opened its hatchback.

■ Voluntary intoxication which negates the existence of a mental state which is an element of a crime is an affirmative defense. In order to constitute an affirmative defense, voluntary intoxication must be so extreme as to suspend all powers of reason. There are many levels of intoxication through which an individual may pass before he or she reaches the level of being incapable of the formation of the intent to commit a crime. If the evidence is sufficient to raise this affirmative defense, the State has the burden of rebutting it beyond a reasonable doubt by proving the defendant was aware of his actions at the time of the offense. (*People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 460 N.E.2d 60.) The weight to be accorded testimony relating to the affirmative defense of voluntary intoxication is peculiarly within the province of the trier of fact. *People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345.

■ In determining whether a defendant was so intoxicated his or her powers of reason were totally suspended, the trier of fact is not obligated to rely on the testimony of experts to the exclusion of other evidence relevant to the defendant's mental state. Rather, the trier of fact may consider the opinions of experts together with all of the other evidence relevant to the defendant's mental state at the time of the offense and reject the expert testimony if it deems the other evidence more probative. See *People v. Ehrich* (1988), 165 Ill. App. 3d 1060, 1068, 519 N.E.2d 1137, 1142; *People v. Jones* (1977), 56 Ill. App. 3d 600, 371 N.E.2d 1150.

Dr. Carroll did not testify the powers of reason of the hypothetical persons possessing the Bradneys' characteristics would have been totally suspended as a result of their ingestion of drugs and alcohol in the quantities which the Bradneys stated they consumed during the 10-day period preceding and including June 8, 1985. Rather, Dr. Car-

roll stated the powers of reason of the hypothetical persons would be impaired. Thus, Dr. Carroll's testimony does not directly support a conclusion the Bradneys' powers of reason were totally suspended when they burglarized the Moses' residence.

■ There is ample circumstantial evidence on the basis of which the circuit court could have discounted the Bradneys' testimony and the expert testimony which they presented concerning their degree of intoxication when they burglarized the Moses' residence and concluded their powers of reason were not totally suspended on that date. In order to burglarize the Moses' residence, it was necessary for the Bradneys to drive from their home in Alton and either cross a river on a ferry or travel a circuitous alternate route in order to arrive at the Moses' residence in the southern part of Calhoun County. They backed Linda's automobile into the Moses' driveway, most likely in order to facilitate the task of carrying stolen goods from the house or to avoid the possibility of anyone seeing them removing stolen property. They gained entry to the Moses' residence through a basement window, and there is some evidence one or both of the Bradneys wore gloves in order to avoid leaving fingerprints in the Moses' home. Additionally, they were able to quickly formulate an alibi when they were discovered on Marvin Gelber's farm. This evidence is simply inconsistent with the proposition the Bradneys' powers of reason were totally suspended on the day they burglarized the Moses' residence. It provides a sufficient basis for the circuit court's implicit finding the State disproved the Bradneys' affirmative defense of voluntary intoxication beyond a reasonable doubt.

### III. Electrophoretic Analysis of Dried Bloodstains

The Bradneys assert the circuit court erred in admitting the results of electrophoretic analysis of dried bloodstains found in the Moses' residence and in Linda Bradney's automobile following the burglary of the Moses' residence. The Bradneys concede electrophoretic analysis of fresh blood is generally accepted in the scientific community. However, they assert electrophoretic analysis of dried blood, which may have been exposed to any of a number of contaminants, is less reliable than electrophoretic analysis of fresh blood. They argue the State did not present evidence electrophoretic analysis of dried blood has gained general acceptance in the scientific community. They further assert the alleged error in admission of results of electrophoretic analysis of dried bloodstains could not have been harmless, since the bloodstains found in the Moses' home were the only physical evidence placing Bruce Bradney at the scene of the burglary.

The State first asserts the results of electrophoretic analysis of dried bloodstains which was presented at the Bradneys' trial did not specifically identify Bruce as the person who burglarized the Moses' residence, but instead only established Bruce could not be excluded as the burglar. The State also asserts the results of electrophoretic analysis of dried bloodstains were corroborated by the fact Bruce had a cut on one of his fingers when arrested. The State notes the circuit court stated the blood analysis testimony was not necessary in order for it to reach its decision, and argues admission of results of electrophoretic analysis of the dried bloodstains, if error, did not prejudice the Bradneys, since strong nonscientific evidence linked them to the crimes of which they were convicted.

 Dennis Aubuchon, a forensic serologist with the Illinois Department of Law Enforcement, testified with regard to the electrophoretic analysis of the dried bloodstains found in the Moses' home and in Linda Bradney's automobile following the burglary of the Moses' residence. According to Aubuchon:

"[Electrophoresis] is a method of separating blood proteins present in human blood and categorizing them according to the various phototypes present in the systems that we are testing for. Simply put, it's a method of typing other than ABO. It's a method of breaking down the blood group further. It's a technique whereby we can determine whether or not a person has a different, in this case, ESD type or PGM type. Those standards are [esterase-D (ESD)] and Phosphoglucomutase [PGM], proteins present in human blood; and they are typeable and distinguishable from each other on the basis of my tests.

* * *

[PGM] exists in different molecular forms; in other words, the different molecular forms would all perform the same function in the human body; but they would be detectable as being different in different people or belonging to several common types similar to the ABO groups. You could have PGM1, PGM21, PGM2, being the most common types * * *.

* * *

There are rare ones, too; but we generally deal with these three. * * * The main thing to understand is that there are three common types that you would see by staining a particular plate, taking pictures of the plate and then reading the results after they've been incubated."

Testing for different types of ESD enzymes is also one of the electrophoretic techniques of blood analysis. The ESD test is run at the

same time as the PGM test but is developed and read separately from the PGM test.

Aubuchon first began performing electrophoretic tests of blood in 1975, and there has never been a dispute concerning the accuracy of this technique as applied to liquid blood. In discussing the reliability of electrophoretic analysis of dried bloodstains, Aubuchon stated:

> "In all the cases I've worked on, literally hundreds, I've never found any discrepancies that would lead me to believe that it would be unethical or unreliable to use [electrophoresis]. To the contrary, I've many many times have resolved questions using these systems. I've always been able to look at my results and feel they were clear cut, and I have never had any problems with the system.
>
> The only problem, if I do see a particular band or pattern that isn't, doesn't make sense, simply inconclusive [sic]. I don't bother deciding why. It is true that eventually blood will break down, and you won't get any—the enzymes will simply degrade. You won't detect them. So the analyst has to use his individual experience to decide when these are readable, when the results are reliable and when not, etc.
>
> *** I've used this for many years, and there are times when blood is decomposed. The case in front of me is not one of those times."

On cross-examination, Aubuchon acknowledged he had no way of knowing whether the dried blood found in Linda Bradney's automobile and in the Moses' home had been contaminated before he tested it.

On examination by the court, Aubuchon testified as follows with respect to the decision in *People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270, where the court held admission of results of electrophoretic analysis of dried bloodstains was reversible error when considered in the view of the closely balanced evidence:

> "I read the decision ***. There was no objection on the use of electrophoresis in fresh liquid blood standards. The objection was in, which I have been asked about here, well how do you know what this dried blood has been subjected to. How do you know that it wasn't contaminated. How do you know that it hadn't degraded partially, and this was the objection; and I don't know that it hasn't. All I can go by is that am I looking at a logical type here. Do my readings make sense to me, and there's no reason for me to believe that, say, a type 1, would decompose into a type 21. It would decompose, but it would de-

compose into something from my experience that is unreadable, undetectable and eventually going into something that's eventually dust.

I have never seen a type disintegrate into another readable type."

Aubuchon's tests revealed the blood found in both Linda's automobile and the Moses' residence, as well as the blood contained in samples obtained from Linda and Bruce, was ABO type O. Also, both Linda and Bruce have PGM type 1 blood. However, further testing revealed Bruce's blood is ESD type 21, while Linda's blood is ESD type 1. The blood discovered in the Moses' home was ESD type 21. Thus, that blood could have come from Bruce but not from Linda. Aubuchon was unable to exclude either Linda or Bruce as the person whose blood was found in Linda's automobile. Aubuchon further testified American Red Cross statistics indicate the combination of characteristics present in Bruce's blood and in the blood found in the Moses' residence—ABO type O, PGM type 1, ESD type 21—occurs in approximately 5.4% of the Caucasian population of the United States.

██ Scientific opinions relevant to factual issues must be premised on principles which have gained general acceptance in the scientific community in order to be admissible. *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734; see *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.

At least four previous Illinois decisions have considered the admissibility of the results of electrophoretic analysis of dried substances. In the first of these decisions, *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 138, 102 S. Ct. 170, the forensic scientist who analyzed dried bloodstains testified she had performed electrophoretic tests thousands of times. She stated in performing the tests, she kept in mind the fact there might be some difficulty in typing aged bloodstains and performed the ESD test several times until she obtained a clear result.

The defendant contended electrophoretic analysis of dried bloodstains is unreliable. In support of this contention, the defendant introduced a journal article indicating the accuracy of electrophoresis is subject to doubt when it is performed on aged bloodstains. Additionally, the defendant presented the testimony of two experts who questioned the reliability of electrophoretic analysis of dried bloodstains. However, one expert had never performed electrophoretic tests, and the other had not performed the tests for some time. This court affirmed the circuit court's denial of the defendant's motion to exclude

testimony concerning the results of electrophoretic analysis of dried bloodstains.

In *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, the court did not hold electrophoretic analysis of dried bloodstains unreliable as a matter of law, but concluded the record and the case law presented unanswered questions concerning the scientific acceptance of the technique. The appellate court's reversal of the defendant's conviction was premised on trial errors other than admission of results of electrophoretic analysis of dried bloodstains.

This court likewise held in *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272, electrophoretic analysis of a dried semen stain was not unreliable as a matter of law. In *Redman,* there was no objection to the foundation for the testimony of the State's expert witness concerning the results of electrophoretic analysis of the semen stain, and any objections to the foundation for that testimony were therefore waived.

The most recent Illinois decision to consider the admissibility of results of electrophoretic analysis of dried bloodstains is *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165. Relying in part on a South Dakota case (*State v. Dirk* (S.D. 1985), 364 N.W.2d 117), the court held electrophoretic analysis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood, and results of tests using this technique are therefore admissible. The court noted concerns aging and possible contamination of bloodstains may create false readings have been recognized by forensic scientists in evaluating the results of electrophoretic analysis of dried bloodstains, and these variables are a factor considered by forensic scientists in detecting genetic markers in dried bloodstains.

■ The previous Illinois decisions which have considered the admissibility of results of electrophoretic analysis of dried substances make it clear this investigative technique is not unreliable as a matter of law. None of these decisions have imposed a requirement the State establish the reliability of this technique through the testimony of impartial expert witnesses who are not employed by law enforcement agencies. In the absence of the presentation of expert opinion supporting the defendants' position electrophoretic analysis of dried bloodstains is unreliable as a matter of law, such as that presented in *People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270, we decline to impose such a burden on the State. To the extent the cases from other jurisdictions on which the Bradneys rely (*Young,* 425 Mich 470, 391 N.W.2d 270; *People v. Brown* (1985), 40 Cal. 3d 512, 726 P.2d 516, 230 Cal. Rptr. 834) impose such a requirement, we decline to follow

those decisions.

In the present case, Dennis Aubuchon implied contamination or deterioration of a blood specimen does not alter the ESD or PGM enzyme discovered in the specimen. Rather, contamination or deterioration produces a substance in which neither of these enzymes are clearly detectable. The Bradneys presented no evidence which contradicted this facet of Aubuchon's testimony.

The testimony presented in this case, as well as previous decisions of Illinois courts, establish electrophoretic analysis of dried bloodstains is generally accepted in the scientific community, is not unreliable as a matter of law, and the enzymes detectable in dried blood are not altered as a result of contamination or deterioration. For these reasons, we hold the circuit court did not err in admitting Dennis Aubuchon's testimony as to the results of electrophoretic analysis of the dried bloodstains found in the Moses' residence and in Linda Bradney's automobile.

## IV. BLOOD CHARACTERISTICS FREQUENCY

The Bradneys assert the circuit court improperly permitted Dennis Aubuchon to testify as to the probability the bloodstains found in the Moses' residence consisted of Bruce's blood, since Aubuchon did not positively identify the source of the statistics on which this statement was premised, and the statistics were not admitted into evidence.

The State argues statistics such as those on which Aubuchon based his testimony are highly reliable, since they are used for such purposes as determining blood types in connection with blood transfusions. The State also argues the probative value of this evidence far outweighed any prejudice to Bruce Bradney, given the strong nonscientific evidence linking him to the crimes with which he was charged.

Aubuchon testified the statistics concerning the frequencies of blood characteristics on which he relied were gathered by the American Red Cross. He later stated the statistics were in a scientific paper which he "would have to go and actually dig *** up [in order to] tell you exactly where it came from." According to Aubuchon, the statistics were gathered from the "broadest base that we could get from a reliable source." He stated such statistics should be a "rough guideline" and implied they may contain a .2% margin of error.

As noted by the Bradneys, the admissibility of expert opinion is conditioned upon the laying of a proper foundation for the opinion, and the facts on which an expert opinion is premised must generally be introduced into evidence. (*People v. Driver* (1978), 62 Ill. App.

3d 847, 379 N.E.2d 840.) Experts may, however, premise their testimony on information and opinions obtained from the reading of standard publications in their fields, and the cases do not impose a requirement experts name the publications on which their opinions are premised. (See *Carter v. State* (1851), 2 Ind. 617; *State v. Baldwin* (1886), 36 Kan. 1, 12 P. 318.) Also, experts may testify concerning the general opinion of a profession as to a certain matter. See 6 J. Wigmore, Evidence §1694, at 12-13 (Chadbourn rev. ed. 1976).

■■■ Blood characteristic frequency statistics for the general population in the United States are a matter as to which there is a general consensus of opinion in both the medical and forensic science professions. Aubuchon testified the statistics on which he relied were derived from American Red Cross studies involving large numbers of blood specimens taken from the population of the United States. (This court denied a motion by the Bradneys to supplement the record with a letter from the American Red Cross, not introduced into evidence at trial, which purportedly establishes the Red Cross was not the source of the blood characteristic frequency statistics on which Aubuchon relied.) In view of the general consensus of medical and forensic science opinion as to this matter and the failure of the Bradneys to present at trial any evidence contradicting the relevant portion of Aubuchon's testimony, we hold Aubuchon's failure to name the publication which contains the statistics on which he relied did not preclude the admission of his testimony relating to the frequency of blood characteristics.

### V. Chain of Custody

The Bradneys contend the State did not establish a proper chain of custody for the blood samples taken from them for comparison with blood discovered in the Moses' home and in Linda Bradney's automobile. The Bradneys assert the blood samples were not properly marked and identified, and the State failed to call a witness (Michael Brown) who came into contact with Linda's blood samples. Furthermore, they contend the State's evidence does not sufficiently exclude the possibility the blood samples were naturally altered before testing due to environmental conditions such as weather, heat or humidity.

The State contends the Bradneys' blood samples could not have been tampered with, because once they left the possession of Sheriff Meyer, they were in the custody of a crime laboratory in Fairview Heights. The State further contends the transportation of the blood samples to the crime laboratory in insulated containers excluded any possibility they were altered as a result of environmental factors. The

State also notes in order to establish a sufficient chain of custody, it is not necessary every person in the chain testify. The State contends it established a proper chain of custody by presenting evidence the Bradneys' blood specimens were drawn at a medical facility, were personally transported by Sheriff Meyer to a scientific laboratory, and were tested at that laboratory.

In their reply argument, the Bradneys maintain the State's contention the containers in which their blood samples were transported were designed to protect the samples during transportation has no support in the record. Also, the Bradneys assert the State did not refute the testimony of its own witnesses that blood deteriorates if unrefrigerated or unpreserved. Finally, the Bradneys assert the State did not rationalize the fact their blood samples were improperly marked.

At the Bradneys' trial, Rosalind Angel, a laboratory technician at the Calhoun County Medical Center, testified she drew blood specimens from Bruce Bradney on September 27, 1985. Angel placed the samples of Bruce's blood in hematocrit tubes. Her normal practice is to seal the ends of such tubes with clay. The tubes are so thin they cannot be labeled. According to Angel, blood specimens need not be refrigerated, but exposure to heat can cause the components of blood specimens to change.

Sheriff Meyer testified he personally accompanied Bruce and Linda Bradney to medical facilities for the purpose of obtaining blood specimens from them. He stated the blood specimens of both defendants were drawn in his presence and handed to him. On both occasions, Meyer tagged the blood as evidence. Meyer transported the tubes containing the Bradneys' blood samples to the crime laboratory in a small insulated styrofoam case containing slots which fit the tubes holding the blood samples. Meyer believed he handed Linda's blood specimens to Dennis Aubuchon when he arrived at the Fairview Heights Crime Laboratory. However, there were other personnel at the crime laboratory when Meyer was there. Also, Meyer made several subsequent trips to the crime laboratory, and "dealt with [Aubuchon] throughout the course of this coming and going." Aubuchon also returned the blood specimens to Meyer.

The Bradneys introduced into evidence a document indicating Aubuchon received Linda's blood specimens from forensic scientist Michael Brown.

Evidence which is of such a nature as to be easily susceptible to alteration, tampering or contamination may not be admitted unless the proponent of the evidence establishes a chain of cus-

tody sufficient to render it improbable the original evidence has been exchanged with other evidence, contaminated or tampered with. (*People v. Cole* (1975), 29 Ill. App. 3d 369, 329 N.E.2d 880.) Establishment of a sufficient chain of custody does not require every person involved in the chain to testify; nor need the State exclude all possibilities the evidence may have been subject to tampering. (*People v. Winters* (1981), 97 Ill. App. 3d 288, 422 N.E.2d 972, *cert. denied* (1982), 455 U.S. 923, 71 L. Ed. 2d 464, 102 S. Ct. 1282.) The fact persons other than those who testified at trial had access to the area where evidence was stored does not require a holding the State failed to establish a sufficient chain of custody. (See *People v. Harper* (1962), 26 Ill. 2d 85, 185 N.E.2d 865, *cert. denied* (1963), 372 U.S. 966, 10 L. Ed. 2d 130, 83 S. Ct. 1092.) The abuse of discretion standard governs review of circuit court decisions to admit evidence over chain of custody objections. *People v. Irpino* (1984), 122 Ill. App. 3d 767, 461 N.E.2d 999.

■ There is no basis for the Bradneys' contention the circuit court abused its discretion in admitting evidence of the results of the tests of their blood because their blood samples may have been altered due to climatic factors or because the samples were improperly labeled and identified. It may be inferred from Rosalind Angel's testimony blood samples do not deteriorate unless exposed to extreme heat, and Sheriff Meyer testified he transported the Bradneys' blood samples to the crime laboratory in an insulated styrofoam container. In view of the Bradneys' failure to present any contrary evidence, the circuit court could properly have found on the basis of this testimony the Bradneys' blood specimens were not exposed to conditions which could have altered components.

As for the identification of the Bradneys' blood samples, Angel testified the tubes containing the samples were too small to label, and Sheriff Meyer stated he tagged the blood specimens as evidence. From this testimony, the trier of fact could reasonably have concluded Meyer adequately labeled the styrofoam containers which held the tubes containing the Bradneys' blood samples.

Sheriff Meyer's testimony he handed Linda's blood specimens to Aubuchon rather than Michael Brown and the State's failure to call Brown as a witness did not preclude admission of the results of the tests of Linda's blood specimens. Sheriff Meyer's frequent trips to the crime laboratory, frequent contacts with Aubuchon, and the approximately 13 months elapsed between the time the blood specimens were obtained and the date of trial provide an adequate explanation for Sheriff Meyer's possible confusion as to the person to whom he

handed Linda's blood specimens. If Meyer did, in fact, hand Linda's blood samples to Brown, the State's failure to call Brown as a witness did not in itself preclude the circuit court from concluding the State established a proper chain of custody for Linda's blood samples.

Neither of the two cases on which the Bradneys rely in support of their contention the State did not establish a proper chain of custody for their blood specimens supports their position. In *People v. Brown* (1972), 3 Ill. App. 3d 879, 279 N.E.2d 382, a whiskey bottle was the sole item of evidence offered in support of an illegal transportation of alcohol charge. The arresting officer placed the bottle in his locker shortly after the defendant's arrest, where it remained until the time of the defendant's trial. The arresting officer did not tag the bottle or seal it. Other persons may have had access to it between the time of the defendant's arrest and trial. Therefore, the appellate court held the bottle was improperly admitted into evidence. In the present case, by contrast, the blood specimens were tagged and taken to a crime laboratory immediately after they were drawn.

In *People v. Anthony* (1963), 28 Ill. 2d 65, 68-69, 190 N.E.2d 837, 839, the court held the State established a proper chain of custody for a substance containing heroin. *Anthony* supports the State's position to a much greater extent than the Bradneys', for there the court held the State's failure to call as a witness a crime laboratory employee to whom the arresting officer handed a bag containing the heroin-based substance did not provide a basis for holding a proper chain of custody was not established.

The State established a sufficient *prima facie* chain of custody for the blood samples obtained from the Bradneys. Absent evidence of possible tampering with the blood samples or evidence the samples were in fact altered as a result of climatic or environmental factors, the circuit court did not abuse its discretion in admitting into evidence the results of the tests of those samples.

VI. Alleged Abuse of Discretion in Sentencing

At the Bradneys' sentencing hearing, Linda testified she had no present recollection of the burglary of the Moses' residence because at that time she and Bruce were high on drugs and alcohol. She further stated she considered herself addicted to both chemicals and alcohol and had in the past been under psychiatric care for mental problems. Linda also testified stated she was remorseful for any harm or grief she had caused with respect to the burglary of the Moses' residence.

Linda's presentence report and the certified records of prior convictions introduced at trial disclose the following prior convictions:

| DATE | OFFENSE | LOCATION | SENTENCE |
|------|---------|----------|----------|
| 3/7/81 | Theft under $300 | Wood River, IL | $130 fine and costs |
| 3/11/82 | Indecent liberties with a child (5 counts); Aggravated incest (1 count) | Madison County, IL | 5-year concurrent terms of imprisonment on each count |
| 6/10/85 | Residential burglary | Godfrey, IL | 10 years' imprisonment |

Bruce Bradney testified he is 46 years old and in poor health. He suffers from asthma and emphysema. He has recently undergone eye surgery and is legally blind in his right eye. His left eye permanently contains particles of a foreign substance. He further stated his kidney and spleen have been surgically removed. He has been addicted to drugs and alcohol since he was a teenager but thought he had overcome his addiction.

Bruce further testified he has no recollection of committing a residential burglary in Calhoun County and has no recollection of the time period during which the Moses' residence was burglarized. However, he remembered the day he was released from prison because: "I didn't drink anything or have any drugs and no intentions of it." Later, after Linda was denied early release from parole he thought:

"I am free to leave the state. I have a job at another place. We have a place to live in another state and we can't go. We're stuck right here.

\*\*\*

Right back in the same place, same drugs."

Bruce's presentence report and the records of prior convictions introduced at trial reveal the following prior offenses:

| DATE | OFFENSE | LOCATION | SENTENCE |
|------|---------|----------|----------|
| 1/1/59 | Intoxication | Alton, IL | Unspecified fine |
| 4/21/59 | Carrying a concealed weapon | Alton, IL | Unspecified fine |
| 9/8/60 | Destruction of property | Alton, IL | Unspecified fine |
| 9/23/60 | Intoxication | Alton, IL | Unspecified fine |
| 4/13/61 | Intoxication | Alton, IL | Unspecified fine |
| 3/26/65 | Armed robbery | Miami, FL | 15 years' imprisonment |
| 2/27/78 | Theft over $300 | Jersey County, IL | 2 years' imprisonment |
| 7/24/80 | Retail theft | Alton, IL | Unspecified fine |
| 9/10/81 | Aggravated battery of a child (2 counts) | Madison County, IL | 7-year concurrent terms of imprisonment on each count |
| 12/14/84 | Battery | Alton, IL | Returned to prison as parole violator |
| 6/10/85 | Residential burglary | Godfrey, IL | 15 years' imprisonment |

At the conclusion of the sentencing hearing, the court sentenced both Bruce and Linda Bradney to extended terms of 25 years' imprisonment for residential burglary and terms of imprisonment of three years for theft over $300.

The Bradneys contend in sentencing them, the circuit court did not give sufficient consideration to various mitigating factors, including their alcohol and drug dependency and their entry of the Moses' residence when the Moses were not at home. Furthermore, the Bradneys note they were not armed during the commission of the burglary of the Moses' residence, and they have no history of violence. They also point out they did not flee when approached by Gelber while on his property and provoked no violence when Gelber discovered them. They also assert their prior criminal records are misleading because the residential burglary in Godfrey of which they were convicted occurred within a few hours of the burglary of the Moses' residence, and both offenses arose out of their heavy drug and alcohol usage during the period preceding June 8, 1985. Additionally, they argue Linda's other Class 1 felonies were of a different nature than residential burglary and involved actions not likely to recur, because Linda's parental rights were terminated as a result of those convictions. Also, they observe Bruce had no Class 1 felony convictions within the 10 years preceding the present offenses, other than the conviction of the residential burglary which took place in Godfrey. They conclude by stating nothing in their behavior mandates sentences 10 years above the statutory minimum for residential burglary on the basis of the threat which they pose to the people of Illinois.

The State argues two of the aggravating factors necessary to support extended terms are present in this case: (1) the offenses were committed against persons 60 years of age or older and (2) both of the Bradneys had previously been convicted of the same class or greater felony within the past 10 years. The State further contends (1) the circuit court may be presumed to have considered all mitigating evidence offered by the Bradneys, even though the court did not specifically refer to it, and (2) because of other contrary evidence, the circuit court was not obligated to accept at face value the evidence which the Bradneys offered in mitigation. Finally, the State observes in sentencing the Bradneys, the circuit court did not completely ignore the possibility of rehabilitation, for they were sentenced to five years less than the maximum extended term for residential burglary and their rehabilitative potential is limited given their poor educational background and prior criminal records.

We need not consider whether the circuit court improperly relied on the ages of the Moses as an aggravating factor, for it is undis-

puted both Bruce and Linda Bradney were convicted of Class 1 felonies within the 10 years preceding their burglary of the Moses' residence, which was also a Class 1 felony. (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(b).) That factor alone was a proper basis for imposition of extended-term sentences on the Bradneys. Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(1).

■ On review, the circuit court is presumed to have considered evidence offered in mitigation, unless there is some statement in the record, other than the sentence imposed, which indicates the court did not consider such evidence. (*People v. Fugitt* (1980), 87 Ill. App. 3d 1044, 409 N.E.2d 537.) In the present case, the record contains no statements which would support a conclusion the circuit court did not consider all of the evidence which the Bradneys offered in mitigation.

■ Although the circuit court must consider all testimony offered in mitigation, it is not obligated to believe such testimony if there is other evidence which undercuts its veracity. (*People v. Matzker* (1983), 115 Ill. App. 3d 70, 450 N.E.2d 395.) In this case, the circumstances surrounding the burglary of the Moses' residence reflect it was a well-planned crime, and the Bradneys were not so much under the influence of alcohol or drugs they could not appreciate the gravity of their wrongful acts. For instance, the Bradneys purposefully drove from their Alton residence to an isolated area of Calhoun County in order to commit the burglary and were quickly able to come up with an excuse for their being on Marvin Gelber's farm. (See discussion of the Bradneys' defense of voluntary intoxication.) Therefore, the circuit court would have been justified in disbelieving the Bradneys' claims their burglary and theft of property from the Moses' residence were attributable to their alcoholism and drug addiction and instead considering those offenses were well planned crimes when imposing sentence on them.

■ A sentence imposed on a criminal defendant is not subject to reversal on appeal unless it represents a clear abuse of the circuit court's discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) It is manifest the circuit court did not abuse its discretion in imposing sentence on Bruce Bradney. Bruce's prior criminal record represents a virtually unbroken string of rather serious offenses dating back to 1965. None of the punishments imposed for these offenses caused Bruce to refrain from engaging in subsequent criminal activities. Thus, with respect to Bruce, the circuit court's emphasis on the objective of protecting society from the offender was well founded.

■ In view of Bruce Bradney's history of serious offenses, the facts he was not armed when he burglarized the Moses' residence, has no history of violence, and none of his offenses during the 10 years

preceding the offenses committed against the Moses (other than the burglary committed in Godfrey on the same day) were Class 1 felonies are of no consequence. Bruce's committing the residential burglary in Godfrey during the same period of purported intoxication as the burglary of the Moses' residence is also of no significance. As the State's Attorney indicated during argument at the Bradneys' sentencing hearing, a holding a prior offense is to be regarded as less of a factor in aggravation for sentencing purposes simply because it allegedly occurred during the same period of intoxication as the offense for which sentence is being imposed would in many cases have the practical effect of merging the two offenses for purposes of sentencing. We decline to engraft such a rule onto the sentencing statutes.

Most of what we have just said with regard to the matters argued in mitigation also applies to the sentences imposed upon Linda Bradney. None of these factors require us to hold Linda's sentences were an abuse of discretion. It is true Linda's record of prior offenses is less extensive than is Bruce's. However, Linda committed three rather serious offenses—the present residential burglary and theft and the residential burglary in Godfrey—while on parole as a result of previously being found guilty of serious offenses. Linda's convictions of aggravated incest and indecent liberties with a child did result from offenses of a different nature from that of residential burglary and theft, but her participation in the burglary and theft of property from the Moses' residence indicates an inability on her part to abide by the norms of socially acceptable conduct. The circuit court could therefore have reasonably concluded fairly lengthy sentences are necessary in order to protect the public from further criminal activity on the part of Linda. Although we may not have imposed upon Linda the same sentences which the circuit court imposed, we cannot say the sentences which the circuit court imposed on her represented a manifest abuse of the court's discretion.

### VII. Credit for Time Served Prior to Sentencing

The Bradneys were arrested for the burglary and theft of property from the Moses' residence on June 11, 1985. On January 27, 1986, they were sentenced by the Madison County circuit court to 15 years' imprisonment for the residential burglary which they committed in Godfrey. (Contrary to the Bradneys' contentions, certified copies of their convictions of the residential burglary in Godfrey, including statements of the sentences imposed, are included in the record of the present case.) The Bradneys were sentenced for the present offenses on January 23, 1987. Their mittimuses do not reflect any sentence credit for

time served prior to sentencing. However, in a letter to Linda dated March 10, 1987, Judge Burrows stated she was entitled to credit for time served awaiting trial.

The Bradneys contend they are entitled to credit on their sentences for the entire period of time between the date of their arrests for the present offenses and the date they were sentenced for these offenses. They therefore request we remand this cause for issuance of amended mittimuses reflecting they are each entitled to 592 days' credit on their sentences.

The State concedes the Bradneys are entitled to 231 days' sentence credit for time spent in custody between their arrest on the present charges and their January 27, 1986, sentencing for the residential burglary which they committed in Godfrey. However, the State argues the Bradneys are not entitled to credit on their sentences for time spent in custody after they were sentenced for the Godfrey residential burglary, since the time they have spent in prison after that date represents time served on an unrelated offense.

Individuals sentenced to prison are generally entitled to one day of credit on their prison sentence for each day spent in custody as a result of the offense for which they were sentenced to prison prior to their arrival at a Department of Corrections facility. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—7(a), (b); 1003—6—3(a)(2).) Sentences imposed on a defendant who is already serving a sentence for a prior offense may be either concurrent with or consecutive to the sentence imposed for the previous offense. Sentences run concurrently unless otherwise specified by the court. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).) In the present case, the Bradneys' mittimuses do not indicate whether their sentences are to be served concurrently with or consecutive to unexpired sentences imposed with respect to prior offenses. Thus, the Bradneys' sentences for the burglary and theft of property from the Moses' residence must be deemed to run concurrently with any prior unexpired sentences.

On facts similar to those here present, the Fifth District of this court has recently concluded a defendant who is serving a sentence for a previous offense and fails to post bond while awaiting trial or sentencing on a second charge is entitled to credit on the sentence for the second offense for the period of incarceration between the date he or she was charged with the second offense and the date sentence was imposed for that offense. The rationale for this holding is even if the defendant were not serving a sentence for the first offense, he or she would still be subject to detention as a result of his or her failure to post bond with respect to the second charge. Thus in such situations,

the defendant is incarcerated as a result of both offenses prior to being sentenced for the second offense. *People v. Higgerson* (1987), 157 Ill. App. 3d 564, 510 N.E.2d 574; *People v. Powell* (1987), 160 Ill. App. 3d 689, 513 N.E.2d 1162.

*People v. Krankel* (1985), 131 Ill. App. 3d 887, 476 N.E.2d 777, on which the State principally relies, is factually distinguishable from the case at bar. There, the defendant was sentenced to a prison term which was to be served consecutively to sentences for prior offenses. This court held the defendant was not entitled to credit on the sentence for the second offense for time spent in jail awaiting trial for that offense which was credited to the sentences for the prior offenses. In the present case, by contrast, the Bradneys' sentences are to run concurrently with their sentences for the Godfrey residential burglary. Thus there is no danger they will receive unintended double credit for time spent in custody if they receive sentence credit for all of the time they spent in custody after they were arrested but before they were sentenced for the present offenses.

Because the Bradneys at no time posted bond with respect to the charges stemming from the burglary and theft of property from the Moses' residence, they would have been subject to detention on those charges during the period subsequent to June 27, 1986, even if they had not been sentenced to prison on that date for the residential burglary which they committed in Godfrey. Since at all relevant times prior to being sentenced for the burglary and theft of property from the Moses' residence the Bradneys were subject to detention as a result of those offenses, we hold the Bradneys are each entitled to 592 days' credit on both of their sentences for time served prior to sentencing.

The convictions of defendants Bruce and Linda Bradney are affirmed. These causes are remanded to the circuit court with directions to issue amended mittimuses reflecting both Bruce and Linda Bradney are entitled to 592 days' credit for time served prior to sentencing on their sentences for both residential burglary and theft over $300.

Affirmed and remanded with directions.

LUND, J., concurs.

JUSTICE McCULLOUGH, concurring in part and dissenting in part:

The defendants are not entitled to 592 days' credit for time served prior to sentencing. They are, as the State argues, entitled to 231 days' sentence credit for time spent in custody between their arrest on the

present charges and their January 27, 1986, sentencing for the residential burglary which they committed in Godfrey. The majority distinguishes *Krankel* on the basis that the defendant was sentenced to a prison term which was to be served consecutively to the sentences for prior offenses. The reasoning, however, in *Krankel* should be followed and this court should not follow the decisions of *Higgerson* and *Powell.* Until the defendant in *Krankel* was sentenced, he was in custody on the prior sentence. If we rationalize that the defendants are entitled to sentencing credit during the time from the sentence for the Godfrey burglary until the sentence in this case, the same reasoning should have applied in *Krankel.* Krankel was just as much in custody, not on bond, serving a sentence, and at the same time, not sentenced on the second charge. The question of whether the sentence in *Krankel* was consecutive is not cause for distinguishing this case.

As stated, section 5—8—7(b) provides that the offender shall be given credit "for time spent in *custody as a result of the offense* for which the sentence was imposed." The legislature has specifically provided for granting credit for time served on sentences from another State or district court of the United States. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(e), (f).) There is no similar legislative provision which applies to the facts here.

On January 27, 1986, when the Bradneys were sentenced for the Godfrey burglary and until sentenced here, they were in custody on an unrelated offense. They should not be entitled to credit for time served from the date of sentencing of the Godfrey burglary until the sentencing in this case.

As above suggested, this is not a concurrent-consecutive problem. The sentences are concurrent from the time both sentences are imposed, January 23, 1987. The opinion correctly states the sentence runs concurrently with any prior unexpired State sentence.

In all other respects, I concur with the majority.